## CHATEAUGAY ORE & IRON CO. v. EASTERN TRANSP. CO.

### No. A–14479.

District Court, E. D. New York.
July 9, 1936.

706

Platow, Lyon & Stebbins, of New York City (Leo J. Curren, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City of counsel), for respondent.

BYERS, District Judge.

The barge William B. Diggs owned by the respondent sank and was lost off the New Jersey coast on September 3, 1934, having taken a cargo of 1510 tons, 1800 lbs. of pig iron on August 23, 1934, from the libelant at Albany, N. Y. for delivery at Roebling, N. J.

In this cause recovery is sought by the libelant as assignee of the consignee for the loss of the cargo, namely, $38,757.00. .

The questions raised by the pleadings are:

1. Whether the barge was seaworthy and yielded only to the perils of heavy cross seas which caused her to leak and founder.

2. Whether the respondent is entitled to the protection of the Harter Act (46 U. S.C.A. § 190 et seq.).

3. Whether the respondent was an insurer.

4. Whether the libelant has been reimbursed by insurance for the loss, which insurance was paid for by respondent and the benefit of which extends to the respondent, whereby the underwriters "on whose behalf this action is being maintained are barred from maintaining this suit against respondent" (Answer, art. twenty-second).

As to the latter, there is before the court a document reciting a loan without interest by The Universal Insurance Company to the libelant dated March 15, 1935, of $34,-000.00 repayable only out of any recovery by the libelant in connection with the said pig iron shipped as stated. Assignment of the cause of action and control of litigation, etc., to the insurance company are set forth.

As to the question of seaworthiness, it should be said that the barge was owned by the respondent, and chartered from it by libelant; there are no unusual clauses in the charter party; there is of course a clause requiring the owner to exercise due diligence to make the barge tight, staunch, strong and seaworthy, and relieving it of liability for any loss or damage to cargo occasioned by any defects whatsoever in hull, machinery or equipment, whether existing before the commencement of or arising or developing during the voyage provided all reasonable means have been taken to make the barge seaworthy.

In these circumstances the respondent was a private carrier, a bailee, and is to be held answerable for negligence. The Joseph J. Hock (C.C.A.) 70 F.(2d) 259, at page 260.

This voyage started in Albany, where the cargo was taken. Before that was done, repairs were made to the boiler that furnished steam for the pumps, the whistle, and the winch; namely, two "spots were welded around the mud ring or what is known as the leg of the boiler." That was on August 19, 1934. The boiler was then tested and one or two more leaks developed, and were repaired the next day. The boiler was again tested, and was found to be in good repair.

The barge was towed down the Hudson to the anchorage grounds on Red Hook flats, and lay there for seven or eight days, until departure was had on September 2d at about 1:00 p. m.

During that interval 12 to 14 inches of water or so were made each day, and the pumps cleared this without difficulty. The weather was fair during that entire time, so

that an intake of 8 to 10 inches daily may be regarded as normal on this barge, since the pumps began sucking at 4 inches. There is uncontradicted testimony that this is a customary leakage of such barges.

The tanks supplying fresh water to the boiler, and for the use of those on board, were filled at Albany. So much as had been consumed of the contents by September 1st was replaced by the tug Baldrock on that day. It does not appear how much water was so required but the testimony is that the tanks carried an adequate supply for fourteen days when the barge was operating.

The Diggs was a wooden barge, built in 1918, 203 feet long, and 36 feet in beam, having 14-foot sides. Her carrying capacity was around 1800 tons and her prior service had been constant, as will be seen. When loaded on this voyage she had a freeboard fore and aft of from 6 to 7 feet and 3½ to 4 feet amidships. Her cargoes and voyages during the year preceding her foundering included:

August, 1933—1500 tons of pig iron, Albany to Roebling, N. J. (Del.River)

February, 1934—1575.71 tons of coal, Newport News to Boston

March, 1934—1020.876 tons scrapiron, Boston to Sparrows Point

April, 1934—1103.5 tons steel rails, Sparrows Pt., Md., to Portsmouth, Va.

May, 1934—12730 railroad ties, Fredricksburg to Weehawken

June, 1934—1197 gr. tons steel skelp, Sparrows Pt. to Albany

June, 1934—1500 gr. tons pig iron, Albany to Roebling

July, 1934—1500 gr. tons pig iron, Albany to Roebling

It was customary, when carrying pig iron, to stow about 10 per cent. of the cargo on deck, i. e., near the rails and in the dead hatches. This was done to equalize the strain on the hull. The 90 per cent. carried in the holds was stowed of course as low in the vessel as possible, and tended to draw the sides together; to equalize that strain, the deck stowage was employed. The charter-party so provided in terms, that is, "Ten percent of each cargo shipped on deck at shipper's risk."

Such was the manner of cargo stowage on this trip.

The Diggs was the second boat in the tow; the head barge was the Morrisette, similar in all respects and carrying the same cargo; the tail barge was the Kunkel, carrying 1340 tons of scrap tin to Sparrows Point, Md. Her capacity was the same, but her load was lighter, all stowed below, and she rode higher.

Hawsers were paid out leaving the lower bay, 225 fathoms from the tug to the head barge, and 200 fathoms from the latter to the Diggs, and the same from her to the Kunkel.

Passing Sandy Hook, the wind was light from the east, northeast, and the seas were moderate.

Nothing occurred of moment until about 10:00 p. m., when the tow was off Asbury, when all vessels began to feel the effects of swells, probably caused by easterly winds which had prevailed for a number of days; the tug and the barges were rolling in the swells, and this caused hull twisting as the barges tended to zigzag because of the lateral play upon the hawsers as the vessels successively mounted the waves, and could not be kept in line.

That was all that happened, but the testimony is unanimously to the effect that the conditions increased in intensity as the night wore on and the morning of September 3rd dawned. From Barnegat Light to Brigantine the swells grew in size, and finally, as the wind freshened, the waves began to cap, and the Diggs and the other barges took green water repeatedly on the port quarter aft, which washed in volume across the decks. This caused much of the deck cargo on the Diggs to tumble about, and some of it washed overside; that is said to have disturbed the equilibrium of stowage which has been referred to; also, as the second vessel in the tow, she was yawing under the influence of the fore and aft hawsers which held her in position, and her pumps proved inadequate to the task of clearing her. Whether seams were opened on deck, as well as below, does not appear definitely. By 10:00 o'clock a. m. or so, she blew five blasts of her whistle (requiring 60 lbs. of steam pressure) and the tug was apprised of her difficulties; the latter did not at once respond (apparently the captain misread an intermediate signal), so the signal was repeated in twenty minutes. The tug then turned back, and ordered the other barges to anchor, after first inquiring of their masters if they could weather the seas tailing off to leeward from their anchors. The Kunkel was quite confidently in the affirmative, and the Morrisette acquiesced,

albeit she asked the tug to lose no time in returning.

The Diggs' hawser was taken from the Morrisette by the tug, and the effort was made to tow her alone to the Delaware Breakwater, some 25 miles away. But a quarter of the distance was covered, part of the time in a fog which lifted around 3:00 o'clock. The tug observed that the barge was then down by the head, and learned upon inquiry from the bargee that he thought the Diggs would sink in about an hour. Thereupon it was agreed that those on board should take to the lifeboat and come to the tug. The bargee, his wife and seven year old daughter, and a deck-hand thus made their way to the tug, the barge then being decks to; about 6:00 o'clock she foundered. After marking the position, the tug returned to the other barges, and took first the Morrisette and then the Kunkel to the Delaware breakwater. The former was in such condition from the same cause, that it was deemed necessary to hasten with her, rather than to take both barges in tow.

The reflection is almost automatic that the Diggs could not have been adequate to her task, or she would not have yielded within so short a time to the conditions shown, which would seem to have been those customarily to be encountered by a seagoing barge in these latitudes during the late summer months.

As was said in The T. J. Hooper (C.C. A.) 60 F.(2d) 737, at page 738: "As to each [barge], the fact remains that she foundered in weather that she was bound to withstand. A March gale is not unusual north of Hatteras; barges along the coast must be ready to meet one, and there is in the case at bar no adequate explanation for the result except that these were not well-found. The test of seaworthiness, being ability for the service undertaken, the case might perhaps be left with no more than this. As to the cargoes, the charters excused the barges if 'reasonable means' were taken to make them seaworthy * * *. As will appear, the barges were certainly not seaworthy in fact, and we do not think that the record shows affirmatively the exercise of due diligence to examine them. The examinations at least of the pumps were perfunctory; had they been sufficient the loss would not have occurred."

After discussing the testimony as to the amount of leakage (a foot to 18 inches per day) before this barge left Norfolk, and the comment of the owner's agent that a barge which made five inches was unseaworthy, the court says it is not necessary to depend upon the proof of her leaking when she left Norfolk; continuing: "she began to leak badly under stress of weather before which she should have been staunch, at least so far that her pumps could keep her alive, and her pumps failed." It was that condition which is found to have resulted in the foundering there involved, and the court concludes the subject thus: "If a vessel is to be excused for leaking, she must at least be able to keep the leak down so as not to flood the pumps."

This extended quotation may be justified because it would appear that the cause at bar was largely tried and briefed with The T. J. Hooper as a pattern.

The conditions of wind and sea require more detailed statement than has been made. From the log of the tug, it appears that at 4:00 p. m. on September 2d, about off Shrewsbury, there was an easterly wind and moderate swell; 7:10 p. m. off Sea Girt, moderate easterly wind and swell; moderate easterly wind and sea at midnight; again at 4:00 a. m. of the following day. At 6:48 a. m., near Brigantine, fresh E.N.E. wind, choppy sea; at 8:00 a. m. the same. 10:20 a. m. "Received signal from Diggs, pumps cannot hold leak." "11:20 Received signal from Diggs Pumps cannot hold leak and came alongside etc. Fresh E N E wind and heavy swell from same quarter."

The record from the Barnegat Lightship for this day shows E.N.E. winds from 6 a. m. to noon; force 4 for the first three hours, and force 3 for the following three hours; the weather was cloudy, misty, and a fog prevailed from 9:00 o'clock throughout the day.

From the Five Fathom Bank Light-ship (Brigantine) the wind was from the same quarter, of force 2 at 6:00 a. m. and force 3 from 7:00 o'clock until noon. Weather about the same, except that fog is not recorded until 1:00 p. m. The scale is in evidence and reads as to these respective wind forces:

"2. Wind felt on face; leaves rustle; ordinary vane moved by wind. 4-7 stat. miles per hour. Light.

"3. Leaves and small twigs in constant motion; wind extends light flag. 8-12 stat. miles per hour. Gentle.

"4. Raises dust and loose paper; small branches are moved. 13-18 stat. miles per hour. Moderate."

Neither light-ship record speaks of swells, but under the column of "Remarks" the sounding of fog signals is entered.

It must be apparent from these data, that there was but diffident showing, at best, of wind or sea to account for the conditions which developed upon the Diggs, and to a less extent upon the Morrisette.

Turning now to the precautions taken by respondent to perform its undertaking to make the barge tight, staunch, strong and seaworthy:

In May of 1933 she was dry-docked, cleaned and painted, being in the dock 2½ days. Fire damage (slight) in the forecastle was repaired; in addition the general superintendent of the Norfolk Shipyard Company, who supervised the job, was instructed by the respondent "to go over the barge and put her in order." No limitation was placed upon the operation, which was upon a "time and material" basis; the work done was: Installation of pipe in fresh water pump; renewal of sucking valve bonnet; anchor davit and stop repaired; six foot section of bilge log, both sides, renewed; graving pieces installed; "filled the boiler with water, applied pressure, and caulked and welded where necessary"; searching and caulking of bottom and sides; drained water from bilges.

The superintendent did all that in his opinion was necessary to put the Diggs in condition to carry cargoes coastwise. He testified quite ingenuously: "I was placed in the responsibility to put the ship in order. I went over the job; and all shipyards like to make the bill as high as they can. Well, that was all ($372.00) I could make on that job."

The witness Duffy, cargo surveyor for the Bethlehem Steel Corporation, inspected the Diggs in June of 1934, prior to her voyage in that month from Sparrows Point to Albany with 1197 tons of steel skelp (plate used in making pipe). He examined her timbers inside the hull, and outside as far as possible while she was afloat; he "measured her with a hook," checked up her last dry-docking and finding her satisfactory passed her for loading. He made a hose test on deck to test the seams and butts, which he said would show up the caulking; if it was "slack or leaking anywhere it would show up in the hose test." Skelp is considered perishable cargo because salt water rust "devaluates the pipe."

This witness was not cross-examined by libelant.

On August 16, 1934, O'Shaughnessy, an assistant to the local inspectors in New York, inspected the Diggs, and his report is in evidence; the barge was afloat and he went through the hold, "examined her on the outside and searched her with a caulking iron to see if there was any leaking or the caulking is bad, such stuff as that."

The inspection took about four hours. He searched the seams on the sides of the vessel and the decks, and reported the vessel seaworthy and lawfully equipped. He reported the crew as numbering three, but could not recall seeing any one but the captain—Anderton.

Also it appears that on September 1st a new life-boat was supplied to the Diggs, the mate of the tug deposing that he attended to this himself.

The only part of the barge's equipment which is called into question is the boiler supplying steam to operate the pumps; that is, a pump forward and a pump aft in the lazaret; the suction was forward, it "sucked from aft"; the captain describes the equipment as "Worthington steam, 4 inch suction and 3 inch discharge." The intakes were aft.

In view of her prior trips, inspections and successful handling of these cargoes, her pumps must be deemed adequate, and no criticism is offered concerning their capacity or construction.

All that is known as to the condition of the boiler has been stated; the repairs in June of 1933, and those in Albany just prior to this voyage are thought to have been sufficient and there is no evidence or opinion to the contrary.

The only breakdown in this equipment happened after the second signal given by the Diggs to the tug, at about 10:20 a. m. on September 3d.

As the tug turned and approached the Diggs, Anderton went into the boiler room to fire up the boiler and then observed that the injector line or pipe from the fresh water tank to the boiler had broken, below an ell, caused by the straining. He had observed it functioning 15 minutes before this.

He reported to the tug captain the consequent failure of the supply of fresh water to the boiler, when asking to be taken out of the tow. While the tug was engaged with the other barges as has been related, Anderton went below, cut a length of pipe, threaded it and inserted it where the break occurred, and forthwith resumed the opera-

tion of the pump. The time required for the repair is not stated, but there is no reason to believe that the Diggs foundered because the pumps were out of service during the interval, which is estimated from the testimony as about an hour.

The break was not due to defect in equipment, but to the strain to which it was subjected, in the twisting of the hull.

Thus the barge would seem to have been equipped for necessary repairs, and manned by a person competent to make them.

The pumps continued to function after the repair for the balance of the time that Anderton remained on board; his testimony is clear and direct as to that.

■ The libelant is mistaken in asserting that the supply of fresh water to the boiler was exhausted. The deposition testimony of the tug's captain on the subject of what Anderton said to him, when asking that the Diggs be taken out of the tow, must be understood in the light of what Anderton deposed as a witness on the stand. This admonition is intended to suggest a revision of the libelant's brief on this subject in order that an appellate court may not be misled.

■ The foregoing is believed to cover all matters appearing in the record, concerning respondent's efforts to meet the charter-party requirements, and in the view here taken of the evidence, it is concluded that, in contrast to The T. J. Hooper, supra, the record shows affirmatively the exercise of due diligence by the respondent to meet the charter-party requirements resting upon it.

There are two minor matters touching seaworthiness which should be mentioned. The boiler contained 96 tubes, and two of them had been plugged by Anderton, but it does not appear when. He said it was not an unusual condition to find on barges, and he did not have it remedied when the other boiler repairs were made in Albany. There is no evidence to the effect that the boiler's capacity was reduced 1/48 by this plugging, which may be assumed, or that such reduction had any practical bearing on the situation.

Again, the certificate of the local inspectors recited the presence of a crew of three, on August 19th. On this voyage that crew was not carried, for only Anderton and a 19 year old deck-hand handled the vessel, and the cooking was done by the former's wife.

This vessel did not founder because she was short handed, but because her seams opened below decks mostly. Unseaworthiness therefore cannot be predicated of this circumstance. Hartford & New York Transp. Co. v. Rogers & Hubbard Co. (C.A.) 47 F.(2d) 189.

All elements relied upon by the libelant to establish unseaworthiness have now been stated, and there remains to decide what the evidence establishes on the subject. The court must decide each case according to its own facts in seeking to determine this aspect of the litigation. The Edith (C.C.A.) 10 F.(2d) 684, at page 685. There Judge Hough observed after quoting from The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L. Ed. 241: "It obviously followed that the seaworthiness in respect of which due diligence was required was to be measured in considerable part by the kind of cargo to be laden."

The requirement resting upon the Diggs, then, embraced the taking of this cargo, stowed in the manner and for the reasons explained, for a voyage at sea in which swells of the strength described might be expected. The special strains to which the second barge would be exposed could have been no hidden mystery to experienced towers of coastwise barges, and the latter must be taken to have had in mind the effect upon the Diggs of the several trips which she had made with iron and steel cargoes during the fifteen months that intervened between her last docking and August of 1934.

The leaking daily in quiet waters of from 8 to 10 inches is said by Anderton to have been usual in this and other barges when laden, and that testimony was not contradicted.

It is an element of weakness in the case for the Diggs. If the court were advised by the testimony of other witnesses that the leaking was excessive, there would be a basis for holding that the barge was unseaworthy on breaking ground. In the absence of such, the issue cannot be resolved against the respondent.

It will be seen that the immediately antecedent history of this barge contains nothing that would suggest her inadequacy for the task at hand, save the fact that she leaked when laden, as stated, while at anchorage for the eight days ended September 2d.

Subsequent events—of all tutors the most erudite—demonstrated that the capa-

city to leak was greatly enhanced by the torsional strain incident to this kind of towing in heavy swells, that the pumps were not up to the task laid upon them.

But this does not prove that the pumping equipment was deficient. Clearly it was required to take care of excess water shipped during the course of a customary voyage, but no formula is suggested in the evidence, governing the factor of safety reasonably to be exacted of the pumps of such a barge. Previous voyages had furnished a criterion upon which the respondent could rely in undertaking this one, and the testimony is that no such volume of water had washed across the decks when the earlier cargoes of the same tonnage of pig iron had been safely carried.

Despite the realization that this barge foundered as the result of contact with seas that she ought to have been able to weather, it is impossible, as the evidence is presently understood, to point to any single element of unseaworthiness and to say: "But for this, the barge would not have been lost." If the sinking had been in quiet waters and unexplained, the rule followed in such cases would be easy of application.

In the absence of evidence upon which to predicate a definite finding of unseaworthiness, it is concluded that the respondent has gone forward with its proof sufficiently to meet and overcome the libelant's prima facie showing. This renders unnecessary a consideration of the questions touching the availability of the defense based upon the insurance policy to which reference has been made.

It is necessary to consider, however, the assertion that the respondent itself insured the safe arrival of the cargo at destination. The following language from the charter-party is relied upon: "Transportation Company (respondent) out of the freight rate is to insure and pay the cost of insurance on said cargoes on valuation of $25.65 per gross ton." The argument is that the carrier was an insurer, and was obligated as well to procure insurance. It is thought that the language is not susceptible to such a strained construction; the undertaking was to insure, i. e., to procure insurance. A more carefully worded undertaking was before the Second Circuit Court of Appeals and so disposed of in The Grecian, 78 F.(2d) 657, at pages 660 and 661.

It results that the respondent is entitled to a decree dismissing the libel with costs, to be settled on notice.