THE S. C. L. NO. 9.

In re S. C. LOVELAND CO., Inc.

S. C. LOVELAND CO., Inc., v. LAVINO SHIPPING CO.

GENERAL CHEMICAL CO. v. LAVINO SHIPPING CO.

Nos. 167, 93, 137.

District Court, E. D. Pennsylvania.

Sept. 19, 1939.

See, also, D.C., 37 F.Supp. 396.

Lewis, Wolff, Gourlay & Hemphill and Otto Wolff, Jr., all of Philadelphia, Pa., for Lavino Shipping Co.

Howard M. Long, Rawle & Henderson, and Thomas Mount, all of Philadelphia, Pa., for Loveland Co.

Thomas H. Middleton, of New York City, Dechert, Smith & Clark, of Philadelphia, Pa., and Hill, Rivkins & Middleton, of New York City, for General Chemical Co.

KALODNER, District Judge.

The above three admiralty cases were consolidated and tried together before me without a jury. A brief exposition of some of the undisputed facts will facilitate an understanding of the claims involved in each suit.

General Chemical Company was the owner of a cargo of sulphur aboard the steamship "Commercial Bostonian." On the morning of September 14, 1937, the steamship was moored, bow in, to the south side of Pier G, Port Richmond, Philadelphia, ready to discharge the cargo of sulphur.

At that time, General Chemical Company had contracted with S. C. Loveland Company, Inc., to furnish a lighter for the transportation of the sulphur to Camden, New Jersey; and had also contracted with Lavino Shipping Company to take the sulphur out of the steamship hold by means of buckets, and load part of it upon the lighter—the S. C. L. No. 9.

The lighter was furnished by the Loveland Company and the loading performed by the Lavino Company. Shortly after the loading of the lighter was completed, the lighter careened, capsized and dumped her cargo into the water. The cargo was lost. The lighter then floated bottom up and was subsequently righted by the use of tugs; the lighter had been damaged by the capsizing and her owner was forced to expend money in repairing those damages.

In the ensuing litigation:

The General Chemical Company, as owner of the cargo, filed a libel in personam against the Lavino Company (the stevedore which loaded the lighter) for recovery of damages to the cargo, and the Loveland Company, as owner of the lighter, also filed a libel in personam against the Lavino Company (the stevedore) for the recovery of damages to the lighter.

The third proceeding was a petition filed by the Loveland Company, owner of the lighter, for exemption and limitation of liability. In this proceeding, the General Chemical Company contested the exemption and limitation of liability, and also filed its claim therein against the Loveland Company for the loss and damage of the cargo of sulphur.

There is no contention or claim that any fault resided in the General Chemical Company; its right to recovery of the damages suffered by it in the loss or destruction of the cargo of sulphur is clear; the question is, from whom recovery should be decreed; from the owner of the lighter, from the stevedore, or from both.

The stevedore company appears in only one capacity; it asserts that the loading was done in a proper manner, and that the disaster to the lighter was due to her unseaworthiness.

The Loveland Company, owner of the lighter, appears in a double capacity; contending that the lighter was seaworthy, it defends the cargo owner's action against itself; it seeks to place the blame for the disaster upon improper loading of the lighter, and thereupon rests its claim against the stevedore company for recovery of damages to the lighter.

The General Chemical Company takes the position that (a) the lighter was unseaworthy, (b) the loading was done improperly; through the operation of each and both causes, the lighter capsized; it seeks recovery against both the Lavino Company and the Loveland Company.

This much is perfectly obvious and in effect conceded by all parties: Only one of two, or both, causes resulted in the disaster: (a) unseaworthiness of the lighter, (b) improper loading.

If the lighter is found to have been seaworthy, then General Chemical Company, the owner of the cargo, should recover all its damage from the stevedore Lavino Company; and furthermore, Loveland, the owner of the lighter, should also recover for damages to the lighter from the stevedore Lavino Company.

If the loading was not done improperly, then General Chemical Company, the owner of the cargo, should recover all its damage from Loveland, the owner of the lighter; and Loveland can recover nothing from the stevedore Lavino Company.

█ If the lighter capsized through the operation of both causes—unseaworthiness and improper loading—then the owner of the lighter and the stevedore are jointly and severally liable to General Chemical Company for damage to the cargo, but neither can recover anything against the other.

A determination of what caused the lighter to capsize will furnish the answer to the queries impliedly propounded just above, and fix the relative rights and liabilities involved. A more detailed study of the facts now becomes necessary for that purpose.

The lighter was a wooden box-like affair with raked ends, and with a small house aft. The ends went in 10 feet downward from the deck. The dimensions of the deck were 110 feet 7 inches by 32 feet. The dimensions of the bottom were 90 feet by 32 feet. The depth of the lighter was 10 feet. Her draft unloaded was approximately 28 inches forward and 37 inches aft—a mean draft of 2.7 feet. She carried her cargo on deck, not in the hold. Her carrying capacity was 600 tons. A cargo-bin of boards had been built to hold the sulphur: the side-boards were 2 feet high and the cargo space within the bin was 30 feet by 90 feet.

The lighter was first loaded from No. 3 hatch and No. 4 hatch of the "Commercial Bostonian" to the extent of 254 tons 1460 pounds of sulphur (all tons are long tons—2240 pounds each). She was then shifted forward along the steamer and moved abreast the Nos. 1 and 2 hatches. From those hatches she was loaded with about 62 tons and 740 pounds

more. During the two loadings just referred to, the starboard side of the lighter was the side contiguous to the steamer. Then the lighter was turned around, so that her port side was next to the steamer, and about 20 tons more loaded on to her in that position, resulting in a total load aboard the lighter in the amount of 337 tons.

The loading was completed about 11:30 P. M. on the same day—September 14, 1937. At 12:30 A. M. on the morning of the next day, September 15, about an hour after the loading was completed, the lighter capsized—turned over and floated bottom up.

Witnesses called by the owner of the lighter testified that prior to the time the lighter was turned around all the sulphur loaded on to her from the steamer was being dumped in the space between a line running fore and aft through the center of the lighter (amidships the lighter) and the starboard rail (within the cargo-bin).

The loading was accomplished in this manner: two booms were being operated, both fixed to the mast of the steamer; one lowered an iron bucket into the hold of the steamer, picked up a load of sulphur, and swung it upward out of the hold; then the other boom went into operation and swung the bucket over to a point somewhere above the deck of the lighter, lowering it thence to a point where Seeney, a Lavino Company employee, standing on the deck or on the sulphur already loaded, tipped the bucket with a 6-foot pole, so that the load of the bucket fell onto the deck of the lighter. The witnesses called by the owner of the lighter further testified that this boom, through the angle of elevation at which it was operated, carried to a distance somewhat short of the midshipline of the lighter, so that any load dropped from the bucket must perforce fall on the starboard side of the lighter (so long as the starboard side was next to the steamer).

The same witnesses also testified that in the course of the loading of the greater part of the cargo, and while the starboard side of the lighter was next to the steamer, the lighter developed a progressive and progressively dangerous list to starboard; that frequent warnings, complaints, and protests were made by Gomez, the captain of the lighter, and by Seeney (the Lavino Company employee), to the employees of the stevedore company who were engaged in the task of loading the sulphur from the steamer to the lighter; coupled with frequent requests that the lighter be turned around, so that the loading could be done on the other side, the weight on the lighter equalized between both sides, and the list corrected: but that the protests, warnings, complaints and requests all alike went unheeded until all but 20 of the 337 tons had been loaded on to the starboard side, at which time, as already stated, the lighter was turned around and the last 20 tons or so loaded on to the port side.

Incidentally, it should be mentioned at this point that after the loading was completed, the lighter was cast loose from the steamer, to which it had been moored by lines during the loading, and brought to a point alongside the wharf and inshore from the bow of the steamer, where the lighter remained until she capsized.

The witnesses already referred to also testified that the lighter came to list so badly that water was coming over the starboard side and flowing down an open hatchway aft the lighter—the hatch-cover having floated off down the river.

One of the witnesses just mentioned was Seeney, the employee of the stevedore company, who was tripping the bucket. He was testifying, however, for the Loveland Company, owner of the lighter. He must be characterized as a disinterested witness. Although not a regular employee of Lavino, most of his stevedoring work seems to have been done for them. He was not employed at a weekly wage by Lavino; like other stevedores, he obtained work by the simple expedient of visiting the wharves each day and looking for work until he found it. He had worked a few times for Loveland, but infrequently. He had never been discharged, so far as appears, by the Lavino Company, nor is there any testimony pointing to any special reason for his giving evidence against it.

He furnished strong evidence of improper loading. For example:

"Q. Did you hear any request from anyone that the lighter be turned around before she was turned around? A. Yes, sir, the captain and myself for three hours kept telling him to please turn it around because we were getting worse and worse all the time.

"The Court: Telling who?

"By Mr. Long:

"Q. Telling who? A. A fellow on deck, I don't know his name, the hatch tender.

"The Court: On the deck of the 'Bostonian'? A. That's right, I don't know who he was.

"By Mr. Long:

"Q. He was your boss? A. That is right.

"The Court: Did he work for Lavino too? A. Yes.

"By Mr. Long:

"Q. You say for three hours before they turned around? A. Yes.

"Q. Who was asking for her to be turned around? A. I was, and the man there, he was, too.

"Q. You mean Gomez? A. Yes." (N. T. 236-7.)

And again:

"Q. Why did you want her turned around? A. Every time they put a bucket on she was getting worse and worse all the time.

"Q. What do you mean, 'worse and worse'? A. Every time they put a bucket of sulphur on there it listed so, and the water was getting nearer to the top of the barge, that is why we kept telling him to turn her around. Everything was in shore, nothing off shore.

"Q. What did they say to you? A. They say, 'We haven't got much more, only another three or four more buckets.' Every time we tell them, they say, 'We have only got three or four more buckets.'

"Q. When they didn't turn her around why didn't you or Gomez get up on the ship? A. I couldn't get up there.

"Q. Why couldn't you get up there? A. Well, gee whiz, we were about twenty-five or thirty feet from the deck of the ship.

"Q. No ladder for you to get up? A. No ladder, no.

"Q. Did you or Gomez tell these men why you wanted the boat turned around? A. Sure, both did.

"Q. What did you tell them? A. I tell them to turn it around before she upset, turn over, and he did, too, but they kept saying, 'We only got a little more, only got two or three more buckets.'

"Q. Did you notice the hatch on the after portion of that boat next to the steamer? Did you see the hatchways there? A. Yes.

"Q. Was there any water near those hatchways when you were yelling? A. There certainly were." (N. T. 238-9.)

"Q. When they moved her up, did they move her up in the same position as she had been, or did they turn her around? A. Never turned her around, moved her up as she was.

"By Mr. Long:

"Q. How far had she listed then? A. Well, I don't know just how far, but she was listing bad enough then to turn around.

"Q. Was she down on a level with the water, or above the water? A. One end was down considerable.

"Q. Which end was up? A. The end next to the in shore." (N. T. 241.)

"By the Court:

"Q. You asked them to turn her around, too? A. Yes.

"Q. How many times did you ask? A. Oh, my goodness, I asked over ten or twelve times, myself. I just kept hollering up there.

"By Mr. Long:

"Q. Why did you do that? A. It was dangerous. Every bucket they put on there, it was getting worse and worse, and I was on the lighter.

"By the Court:

"Q. Couldn't you shovel it from that side over to the other side of the ship? A. If I had a shovel I could, but I didn't have time to trip the buckets, and shovel, too. I was tripping the buckets as they came over there." (N. T. 243.)

"They kept on and kept on until the water gradually just about got an inch from the top. I tell you I could almost see it turn over, myself, and this fellow was calling for the other fellow to bring his boat over there." (N. T. 244.)

Gomez, captain of the lighter and employee of the Loveland Company, testified much to the same effect. But—although I do not mean to impugn his testimony in making this statement—he must be classed as an interested witness because of his employment. I have, therefore, dwelt more upon Seeney's testimony.

It seems to have been conceded by all parties that there was no trimming of the cargo: that is to say, none of it was shoveled or otherwise removed from one part of the lighter's deck to another. The sulphur lay where it fell from the buckets.

Witnesses called by Lavino, the stevedore company, contradicted part of the foregoing testimony. It was admitted that all but 20 tons of the sulphur were loaded on to the lighter while she was lying with her starboard side inshore, next to the

steamer: but the Lavino witnesses testified that in tripping the bucket, Seeney could have, and in some cases did, so trip it that the load fell over on the port side of the lighter—the side away from the steamer. This, the witnesses said, could be effected because the stevedore operating the boom could cause the bucket to swing upon the wire from which it was hung, past the midship line of the lighter and on to the port side, even though the boom itself might not have reached that far: in other words, that the load of the bucket could be caused to fall beyond the extent of the boom. These witnesses admitted that there was some listing to starboard on the part of the lighter during the loading, but that it was neither unusual nor dangerous in character or extent. Some witnesses for Lavino also testified that the boom reached beyond amidships the lighter.

In general, the testimony of the Lavino witnesses was to the effect that the loading was more evenly distributed on the deck of the lighter than was claimed by the witnesses for the Loveland Company, who testified that all the sulphur was dumped on one side, the starboard side, prior to the time the lighter was turned around. However, it seems generally conceded that the loading was uneven, with the greater part on the starboard side; and from all the testimony, I have come to the conclusion, without feeling it necessary at this point to make findings of precise figures, that by far the greater part of the cargo was loaded on the starboard side.

So much for the testimony as to loading. On the question of unseaworthiness, the Lavino Company called to the stand Mr. Schaumberg, a marine engineer, and apparently qualified, in the legal sense, to give an opinion as to the seaworthiness of vessels. He testified positively and emphatically that the lighter was unseaworthy. He had made two examinations, one from the inside and one from the outside, and testified in general that the lighter was unseaworthy from two points of view: one, he stated, because of the great amount of rottenness and decay in the wood of which the lighter was built, and the other, the improper condition of her caulking. His testimony as to the latter ground, however, was somewhat impaired by his admission under cross-examination that in stating (under direct examination) that the caulking was in improper condition—to the extent that it rendered the lighter unseaworthy—he had not taken into account the fact that at the time he examined the caulking, it had been submersed in water for a number of days—the interval that elapsed between the capsizing of the lighter and her righting and removal for repair.

On the subject of the rottenness of the planking as amounting to unseaworthiness, however, Mr. Schaumberg was positive, and gave specific instances of too great a width between the seams of the lighter, and of decay in the planks. He emphasized one instance of a plank in the side of the lighter about half way down from the deck where the wood was so decayed that he scraped some of it out with a stick sufficiently to admit daylight from the outside to the hold of the lighter. He admitted, of course, that this aperture did not exist until he had created it by the scraping. He testified that the lighter had a twist in her when he examined the vessel, and stated that it was due to her careening and subsequent righting. He asserted that the twist could not have come from improper loading, nor could the opening of the seams have been caused thereby.

Mr. Schaumberg had examined the boat upon the request of the Aetna Insurance Company, and, as appeared in the testimony, was a paid surveyor for the Aetna. That company insures Lavino, on whose behalf Mr. Schaumberg testified.

Opposed to Mr. Schaumberg's testimony was that of Dr. Cox and Mr. Loveland, who in general testified that the lighter was seaworthy; that some decay is found in all wooden boats, but that the decay in the lighter No. 9 was not greater than normal and did not render her unseaworthy. They further testified that the lighter was properly caulked at the time she was loaded with the carload of sulphur. It was also shown that after the lighter was repaired, she had successfully carried another cargo; and that moreover she had steadily and successfully carried a great number of cargoes for the Loveland Company in past years, and continuously up to the time of the disaster. She had never sunk before.

Dr. Cox qualified as an expert, and Loveland, the defendant, of course, is in the lighterage business.

The testimony occupies 743 pages of the record, and I have been compelled, naturally, to condense severely; but I have given above in summary the most important parts of the evidence upon the factual aspects of the controversy. This, however, should be added:

Mr. Schaumberg also gave the weight of the lighter, calculated upon the basis of her displacement in fresh water, as 223 tons. He then proceeded to state as his expert opinion that even if all the 337 tons had been loaded on one side of the lighter, she would not thereby have been caused to turn over. For, said Mr. Schaumberg, in order for the lighter to turn over, physical laws must be called into operation which would (a) overcome the weight of one side of the lighter—111½ tons, (b) overcome the buoyancy of the lighter—300 tons (being one-half of her 600-ton capacity). To turn the lighter over, Mr. Schaumberg stated, it would be necessary to exert on the starboard side of the lighter a force of 410 tons (approximately one-half the weight of the lighter, plus one-half her buoyancy). Since 337 tons obviously is less than 410 tons, Mr. Schaumberg concluded that a load of 337 tons placed entirely on one side of the lighter could not cause her to capsize.

If this exposition of physical laws by Mr. Schaumberg is correct, then that would settle one phase of the case; the improper loading could not, at least of itself, have caused the lighter to capsize. There was no contradiction of the weight of the lighter, nor of her carrying capacity; we may take those figures for granted.

No witness for the Loveland Company, owner of the lighter, discussed this question—the possibility or impossibility of the improper loading resulting in the capsizing of the lighter—from the viewpoint of abstract physics. The Loveland Company was content to show an improper loading on one side of the lighter and leave the inference to be drawn therefrom that the improper loading caused the disaster.

 This Court, however, takes judicial notice of the existence, operation and effect of physical laws and phenomena; scientific works and treatises and text-books on physics are open to all, and I have considered it proper, in view of the strongly conflicting testimony in this case, to make my own study upon the subject from the physical standpoint, and have come to the conclusions which I now express.

The plan I intend to follow is this: I shall first examine, in the light of altogether elementary physical laws, Mr. Schaumberg's testimony that it was impossible for the lighter to capsize and turn over even though 337 tons were loaded on one side of the deck only, and determine whether his conclusion is warranted, and in consonance with the laws of nature; and I shall then proceed to consider the nature and effect of the physical laws which actually operated upon the lighter, as shown by the facts established by the testimony; and to determine what, in the light of those considerations, may fairly be said to have caused the disaster.

First, then, as to Mr. Schaumberg's evidence, which I now state I have found to be contrary to natural laws.

The fallacy of Mr. Schaumberg's testimony can easily be demonstrated in either of two ways. In the first place, Mr. Schaumberg stated (N.T. 456) that it would require 410 tons of cargo loaded on to one side of the lighter to force a list sufficiently great to bring the loaded deck of the lighter awash. What Mr. Schaumberg apparently did not realize, however, is that, by the same token, a load of 410 tons placed on the other side of the lighter would bring the other deck awash, and so restore equilibrium. This would result, however, in creating an entirely new carrying capacity for the lighter—820 tons instead of the conceded capacity of 600 tons. Vessels cannot gain carrying capacity through mathematical manipulations. The carrying capacity of any vessel (in this case, 600 tons) is the amount of load which she can carry without being submersed. Eight hundred and twenty tons would have sunk the S.C.L. No. 9; but according to Mr. Schaumberg's testimony 820 tons would merely have brought her decks awash.

In the second place, Mr. Schaumberg's statement that the determination of the amount which would have to be loaded on one side of the lighter to bring her deck to the edge of the water is to be determined by adding one-half the weight of the vessel (i. e., the weight of the unloaded side of the vessel) to one-half her buoyancy (i. e., carrying capacity of 600 tons) is tantamount to saying that the weight of the unloaded side of a vessel keeps her up—not down. This is simply impossible. The weight of the vessel keeps her down—not up. It is the buoyant effect of the displaced water which, exerting a force in an upward direction, keeps the vessel up. In effect, Mr. Schaumberg's testimony upon this point amounts to a statement that the buoyancy of a vessel is determined by *adding* the buoyant effect of the water it displaces *to the weight of the vessel.* In truth, however, the practical buoyancy (which equals

the carrying capacity) of a vessel is determined by *subtracting* the weight of the vessel from her total buoyancy. In other words, the total buoyancy of the lighter here involved is 823 tons. Subtracting her agreed weight of 223 tons leaves 600 tons as her carrying capacity.

So much for Mr. Schaumberg's testimony in this regard. The testimony cannot, in the face of the unvarying and immutable physical laws mentioned, be considered as acceptable, and Mr. Schaumberg's conclusions in this connection must be repudiated. His conclusions carry along with themselves the elements of their own disproof.

I now proceed to the second phase of the inquiry: the examination of the nature and effect of the forces acting upon the lighter and the determination of the cause of her overturning. This requires, among other things, a statement of the laws governing the displacement, conditions of equilibrium, and stability of a floating body (such as a lighter). They are as follows:

A body when floating is acted upon by two forces—namely (a) its weight, which acts vertically downward through its center of gravity, and (b) the resultant of the fluid pressures, which acts vertically upwards through the center of gravity of the fluid displaced[1]; but if the body is at rest these two forces must be equal and act in opposite directions; whence follow the conditions of equilibrium, namely (1) The floating body must displace a volume of liquid whose weight equals that of the body[1]; (2) the center of gravity of the floating body must be in the same vertical line with that of the fluid displaced. Ganot's Physics, 16th Ed., 1902, p. 105.

Similar statements in: Natural Philosophy, Deschanel, 13th Ed., 1901, p. 102; Text-Book of Physics, Watson, 7th Ed., 1920, p. 171; Physics, Barker, 1892, p. 158—162.

Since the stability of a floating body is proportional to the height of the metacenter above the center of mass, the stability is lessened as the center of mass is raised. Hence in boats and other vessels the center of mass is kept as low as possible either by ballast or by making the keel of lead and very massive. Barker, p. 162. Also see Encyclopedia Britannica, 11th Ed., Vol. 14, p. 119, Vol. 24, p. 923.

It follows from what has been quoted that if, for any cause (such as uneven loading), the center of gravity of the loaded lighter no longer corresponds in position in space with the center of gravity of the unloaded lighter, then the conditions of equilibrium are no longer met (provided the center of gravity shifts not in a vertical line, but from one side to the other, as it will through uneven loading). The conditions of equilibrium will no longer exist; the center of buoyancy of the displaced water (hereinafter referred to as center of buoyancy) will no longer be in a vertical line with the center of gravity of the lighter. The vessel will then list (toward the loaded side) until the center of gravity and the center of buoyancy (which is also changing because the shape of the liquid displaced changes) will once more be in the same vertical line. This results because the buoyant force of the water acts upwards through the center of buoyancy and the weight of the loaded lighter is a force acting downward through the center of gravity of the lighter, creating what is known in physics as a couple, or rotating movement. Everett's Deschanel's Natural Philosophy, 1873, p. 16. This rotating movement, due to the action of the forces described, continues until equilibrium is restored, i. e., when the center of buoyancy and the center of gravity are brought in a vertical line once more.

Provided the unevenness in loading is not too great, and therefore does not result in too great a shifting of the center of gravity of the lighter, the latter will merely develop a list and remain in that position. If, however, too great a load has been placed on one side of the lighter, the list will be aggravated until the deck on the loaded side goes under water: and if the unevenness of the load is sufficiently great in magnitude, or further unevenness develops, the rotating movement will continue and the lighter will turn over altogether, so that a condition of equilibrium will once more be restored, in that the center of gravity and center of buoyancy will once more be in a vertical line; but whereas in the unloaded lighter the center of buoyancy was below the center of gravity of the lighter, now with the boat floating bottom-up the center of buoyancy will be above the center of gravity.

It has already been stated in this opinion that the disaster could have resulted only from (a) unseaworthiness of the lighter, (b) improper loading, (c) a con-

---

[1] Merely a special case of the principle of Archimedes.

currence of both causes. Each possibility will now be examined in turn.

Let it be assumed for the moment that the lighter was unseaworthy and that water was admitted into the hold, but that there was no improper or uneven loading. What would be the result? It must be remembered that the lighter is a box-like affair with a flat bottom. Water flowing into the hold because of unseaworthiness of the vessel would spread evenly over the bottom of the boat. The result would be and could only be (remembering that the sulphur is assumed to be loaded *evenly* on the deck of the lighter) a steady settling and sinking of the lighter, straight down—she would not sink by the head, she would not sink by the stern, she would not heel or career; she would *settle* evenly at all points; and, provided the load of the cargo were sufficiently heavy, would finally become submerged altogether. *But there would be no listing.*

However, those things did not happen. The lighter did not sink straight down. She did not sink at all (in that sense of the word). She *overturned,* and came to rest floating bottom up. The assumption, therefore, that she sank solely because of unseaworthiness is disproved. (It is true that large steamers sometimes list when the hull is breached, as by the explosion of a torpedo. This, however, is because such steamers are frequently divided by bulkheads into water-tight compartments in the hold, wherefore water entering any one of those compartments would remain on one side, which would result in an uneven ballast and cause a list. The lighter, of course, boasted no water-tight compartments.)

Now to consider the second of the three assumptions—that the lighter was seaworthy, but improperly loaded. It has already been shown that an uneven loading so shifts the relative positions of the center of buoyancy of the displaced water and of the center of gravity of the loaded lighter as to produce a couple, causing the list, which may result in the overturning of the lighter if the conditions creating the rotating movement (couple) of the lighter continue or are aggravated. The fact is that the lighter did finally turn over, on the overloaded side. How it happened that the careening and capsizing took place approximately an hour after the loading was finished is very clear to me; the picture is easily reconstructed, and the fact of the overturning is perfectly reconcilable with the physical laws that have been stated.

Several witnesses gave credible testimony to the effect that the starboard rail of the lighter was awash when loading was completed, and water was coming in over the deck behind the cargo-bin. Since the cargo-bin was certainly not water-tight, it follows that the water of the river was also coming into contact with the sulphur behind the boards forming the bin on the starboard side. The powdered sulphur soaked up the water, steadily increasing the weight on the starboard side, causing an aggravated condition of instability and causing a still further list (so that the starboard rail continued to go more deeply into the water).

Moreover, as the vessel listed more and more, the sulphur, being free to move in its discrete form, shifted and continued to shift over against the boards forming the cargo-bin at the starboard edge of the lighter. This further and continuously aggravated the unevenness of the load, and shifted the center of gravity of the lighter still further over to starboard, thus increasing the couple, or rotating force acting on the lighter (since the magnitude of the couple is directly proportional to the distance between the center of gravity of the lighter and the center of buoyancy,[2] and that distance was being continually increased by the shifting of the center of gravity toward starboard).

It must be remembered that the sulphur could shift considerably without pouring over the top of the cargo-bin on the starboard side, because the sulphur, as conceded, was free to assume an angle of repose of forty-five degrees, and therefore would not pour over the bin until the latter had assumed an angle of forty-five degrees; or, what amounts to the same thing, until the lighter had listed to the extent of forty-five degrees. Such a list, however, is tremendous, and, as can easily be visualized, would bring most of the starboard deck under water. As a matter of fact, if the lighter ever listed to the amount of forty-five degrees from whatever cause, she would probably complete the movement and turn over altogether.

---

[2] Everett's Deschanel, supra, p. 16.

Here then we have two conditions steadily and progressively operating to increase the rotating movement (listing) of the lighter—first, the weight added to the sulphur by its soaking up of the river water (and it must be remembered that this added weight was for the most part concentrated at the very edge of the starboard side of the lighter, where it would have its maximum effect in causing a further listing), and in the second place, the continuous shifting of the sulphur also to the starboard edge. It is patent that the weight on the starboard edge, or on the outermost part of the starboard deck, was continually becoming greater in the interval which elapsed between the completion of the loading and the overturning of the lighter; and the considerations just mentioned afford an entirely acceptable explanation of the lapse of time between those two events. Clearly, the concentration of weight to starboard increased progressively, causing a progressively increasing listing, finally destroying the conditions of equilibrium entirely, and giving the lighter a momentum which turned her over completely, so that she regained equilibrium in the only position possible for her under the circumstances—bottom up.

It has thus been demonstrated that the overturning of the lighter is altogether consistent with the nature of the physical forces operating upon her, and which must have operated upon her, under the facts brought out in the testimony. The second of the three possible assumptions, therefore, has been shown to be perfectly tenable.

It still remains, however, to consider the third possibility—that the lighter might have been caused to turn over by the conjunction of both effects—leakage through the hull due to unseaworthiness, plus the improper loading. This possibility, however, is not supported by analysis. The reason is this: it has already been shown by the quotation from Barker's Physics hereinabove that the stability of a floating body is increased as the center of gravity of the vessel is lowered (lowered in space, that is, not in magnitude). Water coming through the sides of the boat into the hold would, generally speaking, settle at the lowest part of the lighter, and would thus lower the center of gravity. This, under the authority quoted, would increase stability, not tend to destroy equilibrium. Water coming into the hold, therefore, would have a tendency to right the vessel, not to increase the list-ing or couple. The stability of a floating vessel may, for present purposes, be defined as its tendency to right itself after its equilibrium has been disturbed; wherefore, water entering the hold and increasing the stability of the vessel could naturally not be considered as having any part in making the vessel list or turn over. The third possibility, therefore, is shown to be untenable.

I, therefore, arrive at the cause of the lighter's overturning by the process of elimination. As shown, only three possibilities existed (the brief for the Lavino Company speaks of only two possibilities—seaworthiness or improper loading); and, as I have indicated, only one of those possibilities—that of improper loading—withstands the test of analysis as to the cause of the disaster in the light of the laws of nature. The Lavino brief, parenthetically, at page 31, states that if the lighter were unseaworthy water would enter her hold and render her unstable (even though properly loaded). This is simply not so. I have shown that water entering the lighter's hold would render her *more* stable, because it would lower her center of gravity.

The conclusion reached—that the improper loading caused the lighter to turn over—resolves the conflicting testimony with the utmost nicety; it tends to establish the credibility of the witnesses who testified as to improper loading, and, by the same token, tends to discredit the testimony as to unseaworthiness. I may mention at this point that I had come to the same decision (concerning which part of the testimony I was inclined to accept and which to reject) independently of the analysis I have made in the light of physical laws. I have already explained that I was strongly inclined to accept Seeney's testimony as to improper loading, because he hardly could have had any interest in favor of the lighter company. On the other hand, Mr. Schaumberg's expert opinion that the lighter could not have capsized with less than 410 tons loaded on one deck, cannot, as shown, be sustained upon analysis; he admitted that his testimony as to the improper caulking failed to take into consideration the fact of the lighter's submersion in water for a long time; and his testimony as to the rotted and decayed condition of the planking seemed to be exaggerated; moreover, its value was detracted from by countervailing testimony. In general, I accept the evidence of the witnesses who tes-

tified that the vessel was improperly loaded, and do not accept the evidence of the witnesses who testified the vessel was unseaworthy.

I am perfectly aware, of course, that when a vessel sinks in calm weather and smooth water, an inference arises that she is unseaworthy. The inference may be overcome, however, by testimony that something else caused the disaster (e. g., improper loading). See Taylor Bros. Lumber Co. v. Sunset Lighterage Co. et al., 2 Cir., 43 F.2d 700, 702, and cases there cited.

The overcoming of the inference as to unseaworthiness is aided by the testimony of the trips successfully negotiated by the lighter prior and subsequent to her capsizing. Chateaugay Ore & Iron Co. v. Eastern Transp. Co., D.C., 15 F.Supp. 705; Spencer Kellogg & Sons v. Buckeye S. S. Co. (The Briton), 6 Cir., 70 F.2d 146.

It is clear to me that the cargo should have been trimmed by the stevedore company. The fact that this was a deck lighter (i. e., a lighter which carried her load on the deck, and not in the hold, thus lessening the stability of the vessel) only serves to emphasize the duty to trim the cargo. Had this been done, I am convinced that the lighter would not have capsized; and the failure to trim is a breach of duty on the part of the stevedore company. The Robert R., 2 Cir., 255 F. 37. At least, loading should have been stopped when the lighter commenced to list badly and when Gomez, the captain, protested. The language of the Circuit Court in The Robert R., supra, is perfectly apt, and I quote therefrom (255 F. at page 39 et seq.):

"It was one in which circumstances might arise during the performance where the stevedores should call on the steamship to trim, and their failure to do this, and persistence in dangerous loading, rather than the making of a contract which did not call for trimming, were the negligent acts that caused the damage.

"Indeed, the fact that the stevedores did not contract to trim seems to us in no way to relieve the latter from liability. They undertook to discharge the cargo, and were bound to do this in a prudent manner. If it became unsafe to load the barge without trimming, as proved to be the fact, it was the plain duty of the stevedores to stop work and call upon the steamship to trim. Instead of doing this, they continued to pile the ore on the deck of the lighter, without seeing that it was spread by some one, until the center of gravity of the lighter became so high that she dumped her load. * * * If the stevedores had ceased loading and called for trimming and secured assistance, the accident would not have happened. Their continuance in loading when danger was imminent was the proximate cause of the damage and they only are liable in tort. It was the dumping of the last buckets of ore on the lighter that caused the injury. * * *

"If conditions showed that continuance in discharging was unsafe, the stevedores, like any one else, were bound to cease discharging. Only an express contract, or consent, to do dangerous acts, can shift the liability for these acts, and no such situation appears here. * * *

"It is contended that the master of the lighter should have warned the stevedores of the danger. We think the District Court was correct in holding that the contract with the lighterage company was only for carriage and that a price was made which expressly did not include trimming by the lighter. The master of the lighter, as found by the court below, protested repeatedly at what was being done. This protest was made both to the foreman of the stevedores and on the second day to one of the Pellegrinos. * * * We think the master of the lighter did all that could be reasonably expected of him under the circumstances."

I have, heretofore, indicated the conclusions which I have reached. I find that it was the duty of the Lavino Company to do the loading in a proper manner; that it failed to discharge this duty; that the vessel was loaded unevenly, with by far the greater part of the cargo (to the extent of approximately ninety per cent thereof) loaded on the starboard side; that this uneven loading constituted improper loading; and that this improper loading and failure to trim, independently of any other cause, resulted in the overturning of the vessel and in the damage to the cargo and to the lighter. It follows that the General Chemical Company is entitled to recover from the Lavino Company for loss and damage to the cargo of sulphur; and that the Loveland Company is entitled to recover from the Lavino Company for the damage suffered by the lighter.

Let a form of decree be submitted accordingly; also requests for findings of

fact and conclusions of law by both sides. The decree should include a provision for reference to a Special Master to find damages.

The view I have taken of this case renders it unnecessary, naturally, to rule upon the petition of S. C. Loveland Company for exemption from and limitation of liability.

## THE S. C. L. NO. 9.

## GENERAL CHEMICAL CO. v. LAVINO SHIPPING CO.

### No. 137.

District Court, E. D. Pennsylvania.

Jan. 30, 1941.

See also D.C., 37 F.Supp. 386.