**UNITED STATES of America,
Plaintiff,**

v.

**Frank Lorenzi LOPEZ, Defendant.**

**No. 70 Cr 813.**

United States District Court,
E. D. New York.

May 14, 1971.

Edward R. Neaher, U. S. Atty., E. D. New York, Brooklyn, for plaintiff; Daniel M. Armstrong, Asst. U. S. Atty., of counsel.

Milton Adler, Legal Aid, New York City, for defendant; Edward J. Kelly, Brooklyn, New York City, of counsel.

Grunewald & Turk, Brooklyn, N. Y., amicus curiae; Raymond Bernhard Grunewald, Brooklyn, N. Y., of counsel.

## MEMORANDUM

WEINSTEIN, District Judge.

Defendant is charged with concealing and facilitating the transportation of heroin and of conspiring to commit that crime. 21 U.S.C. §§ 173, 174. He has moved to suppress heroin taken from his person.

Presented is the question of whether the anti-hijacking system used at our airports is constitutional. For the reasons indicated below, we hold the system valid. Nevertheless, because in this particular case the elegant and objective method devised by the government to deter and apprehend hijackers was distorted in an irrational and prejudicial way by airlines personnel, defendant's motion must be granted.

## I. FACTS

With his companion, Ernesto Perez Gonzalez, defendant, Frank Lorenzi Lopez, was apprehended on November 14, 1970 at John F. Kennedy International Airport as he was about to board a Pan American flight bound for Puerto Rico. Two Deputy United States Marshals had been called from a trailer adjacent to the Pan American premises where they were stationed in connection with the government's anti-hijacking program. An employee of Pan American had pointed out the two passengers as "selectees"

—persons whose "profile" suggested a substantial likelihood that they were potential hijackers; who had activated a magnetometer, a metal detection device; and who, upon request, had failed to produce identification.

The Marshals approached the two and asked if they would walk through the magnetometer installation again, first with, and then without, a small blue bag that Gonzalez was carrying. Each of them did so, activating the device on both trips. The Marshals again requested identification but none was produced. At this time Gonzalez identified himself by his proper name, indicating that the name Julio Lopez, which appeared on his ticket, was erroneous.

The two travelers were then asked to accompany the Marshals to a private area adjacent to the passenger boarding ramp where their outer clothing was patted down ("frisked") for weapons. A Marshal felt a hard object about 4 inches wide, 6 inches long, and three-quarters of an inch deep under Lopez's clothing. A tinfoil covered plastic envelope tightly packed with white powder had been discovered. Field tested, the powder proved positive for heroin. Gonzalez and Lopez were then arrested.

Both were charged with concealment and facilitating the transportation of the packet of narcotics found on Lopez and with conspiring to commit this crime. The government's evidence at the suppression hearing made it apparent that there was no case against Gonzalez, even if the heroin was admitted. Accordingly, a judgment of acquittal was granted after the government and Gonzalez waived a jury and agreed that the hearing testimony would be deemed received at the trial.

## II

## FEDERAL AERONAUTICS ADMINISTRATION SYSTEM FOR DISCOURAGING AND APPREHENDING POTENTIAL HIJACKERS

In October 1968 a Task Force was appointed to consider methods of combating the increasing number of airline hijackings. Cf. Bibliography on Airplane Hijacking, 26 The Record of the Assoc. of the Bar of the City of New York, 325–332 (1971). A number of interested agencies including the Federal Aeronautics Administration, the Department of Justice and the Department of Commerce were represented. This Task Force included individuals trained in several disciplines including psychology, law, engineering and administration. Dr. John T. Dailey, a well-trained psychologist with a broad practical background in education and government personnel, took a leading role in developing and testing the Task Force ideas. At the hearing he testified at length and impressed the Court with his skill and honesty.

One of the serious problems faced by the Task Force was that many millions of passengers use air transportation. Any practical procedure would have to permit maximum access to aircraft with minimal inconvenience and embarrassment to passengers and almost no delay in the operations of the airlines.

Among the investigations undertaken by this group were a detailed study of the characteristics of all the then known hijackers and of the air traveling public. Background investigations of hijackers as well as visual and photographic studies of boarding air passengers were relied upon. Among the findings were (1) hijackers were generally not highly motivated and resourceful and (2) they shared certain characteristics markedly distinguishing them from the general traveling public. In addition, engineering studies were undertaken of available weapon detection devices.

After thorough field testing of equipment and various screening techniques, the present anti-hijacking system was instituted. Although we are concerned primarily with the preflight apprehension aspect of the system its principal

focus is on deterrence. Involved are the following elements:

1. *Heavy penalties.*

A severe statute with possible death penalties for hijacking was adopted. There already were in force various regulations and statutes prohibiting the carrying on board of firearms and other weapons.

2. *Notice to the Public.*

Signs in English and Spanish are posted at the boarding gates where passengers' tickets are checked reading as follows:

### AIRCRAFT HIJACKING IS A FEDERAL CRIME PUNISHABLE BY DEATH

### CARRYING CONCEALED WEAPONS ABOARD AIRCRAFT IS PUNISHABLE BY PRISON SENTENCES & FINES

### PASSENGERS AND BAGGAGE SUBJECT TO SEARCH

These signs are eleven by fourteen inches with half inch high letters. Warnings of the same or larger dimensions are conspicuously posted at other parts of the air terminal.

While probably not required to give notice of the applicable law and penalties, these signs fill that function. *Cf.* Lambert v. California, 355 U.S. 225, 228–230, 78 S.Ct. 240, 242–243, 2 L.Ed.2d 228 (1957) (felon registration ordinance); United States v. Mancuso, 420 F.2d 556 (2d Cir. 1970) (failure to register as a narcotics law violator before leaving the country). They serve to deter and to reduce the possibility of embarrassment should a passenger's boarding progress be interrupted.

3. *Profile.*

If a passenger meets a prescribed "profile" he is focused on by airline employees. The details of the profile and its use are set out below.

4. *Magnetometer.*

A magnetometer is installed in the passageway leading to the plane so that all passengers must pass through it. It is set to flash a warning light when metal equal to or greater than an average 25 caliber gun in magnetic force deflecting power is carried by. This device is described in more detail below.

5. *Interview by Airlines Personnel.*

A person who triggers the magnetometer and meets the profile requirements is "interviewed" by airlines personnel. If he provides satisfactory identification, he is permitted to proceed unimpeded. Otherwise he is designated a "selectee" and is denied boarding until a Deputy United States Marshal is summoned.

6. *Interview by Marshal.*

The Marshal again requests identification of those designated as "selectees." If satisfactory identification is not furnished it is suggested that the person go through the magnetometer once more. Before walking through, he is asked if he has any metal on his person or in any baggage he is carrying. If he replies in the negative and still sets off the magnetometer, a request is made that he submit to a "voluntary" search. It is explained that this search is part of an attempt by the government to prevent hijacking.

7. *Frisk.*

The Marshal pats-down the external clothing of the subject in order to discover if he is carrying any weapons. Depending upon what is found as a result of the frisk, boarding is permitted or the person is detained.

The program is designed to speed passengers who are unlikely to present danger and to isolate, with the least possible discomfiture or delay, those presenting a substantial probability of danger. At each successive screening stage an attempt is made to permit as many as possible to complete boarding.

While no single screening technique can by itself completely protect the flying public—without creating an objectionable level of disturbance and inconvenience—probabilities are increased by combining several approaches, thus sufficiently reducing the size of the population which must ultimately be physically

interfered with to a practicable and socially acceptable level. *Cf.* Rosado v. Wyman, 322 F.Supp. 1173, 1180–1181 (E.D. N.Y.), aff'd, 437 F.2d 619 (1970) (collecting authorities on use of mathematics in the law); Finkelstein and Fairley, A Bayesian Approach to Identification Evidence, 83 Harv.L.Rev. 489 (1970).

The system seems to serve this purpose well. Whether because of it or for other reasons hijacking decreased in 1970 to approximately 50% of what it was in 1969. No flight fully protected by the program has been hijacked.

One sample consisting of 500,000 screened passengers showed that only 1,-406 satisfied the profile—.28%. Approximately one-half of those were nevertheless permitted to board immediately after failing to activate the magnetometer, leaving 712, or .14% to be interviewed. Of those interviewed, 283, approximately one-third, were actually searched. Therefore, only .05% of the sample were ultimately subjected to a preventive weapons frisk. Twenty persons were denied boarding—approximately $\frac{1}{15}$ of those searched and of these, 16 were arrested. In sum, almost everyone (99.86%) of the one-half million persons passed swiftly through the boarding process without even being asked a question and 99.95% boarded without being searched.

In another sample of 226,000 screened passengers .57% were selected as meeting the profile; .28% were interviewed; and .13% were searched. It was reported that none were searched "involuntarily" and only 24 were denied boarding.

Statistics for a number of covered airlines at the John F. Kennedy International Airport in December 1970 were produced. While the number of passengers using these airlines during this month is not shown, they carried a total of 2,645,-000 passengers during the last six months of 1970—or on the average 441,000 each month. Three hundred and three reportedly met the profile and nine arrests were made. There were confiscations of 10 illegal knives, one tear gas pen, four hand guns, one gas gun and one pack of marijuana. For the reasons described in part VIII, *infra*, of this opinion, the Kennedy statistics, insofar as they are affected by Pan American Airways figures, cannot now be relied upon.

That the risk of hijacking is greatly increased when a passenger possesses weapons can hardly be doubted. In the 80 hijacking incidents involving planes of United States registry up to June of 1970, there were 55 firearms, 20 knives, 14 alleged bombs, 3 razors or razor blades, 1 BB gun, 1 tear gas pen, and 1 broken bottle.

*In camera* testimony was persuasive that the characteristics of the potential hijackers chosen for the profile were well calculated to eliminate safe persons while isolating those likely to be dangerous. No one can be certain, of course, that anyone failing all the tests of the system will be a hijacker. In fact, approximately 14 out of every 15 people who were searched proved to have no weapons and were then permitted to proceed. Moreover, as the facts detailed below indicate, there is always the risk that a soundly designed process will be abused by ignorant, careless or malevolent personnel. As one commentator pointed out

"permitting *any* use of certain mathematical methods entails a sufficiently high risk of misuse, or a risk of misuse sufficiently costly to avoid, that it would be irrational not to take such misuse into account when deciding whether to permit the methods to be employed at all." Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329, 1331 (1971) (emphasis in original).

Measured against the air traveling population as a whole, the method is highly effective in narrowing the group which needs particular attention. Where the risks of hijacking to passengers and crew and to the viability of the entire industry are so great we cannot say on balance that use of the system is imprudent. Whether it meets the reasonableness test of the Constitution is an issue dealt with below.

Before turning to that problem there are two procedural difficulties that need to be resolved. One of them, the issue of *in camera* hearing, raises very serious questions. The other, acceptance of proof that the magnetometer did what it was purported to have done, is relatively simple. We turn to the simple issue first.

## III

## MAGNETOMETER .

The electronic weapons detector—appropriately named "Friskem"—utilized in this case depends upon magnetic field detectors called "flux-gate magnetometers." The unit was developed after conferences with representatives of the Task Force.

Its operation is based upon the physical fact that the earth is surrounded by a relatively constant magnetic field composed of lines of flux. Steel and other ferromagnetic metals are much better conductors than the air. As a result, when any such metal moves through an area, nearby magnetic lines of flux are distorted to some degree as they tend to converge and pass through the metal while seeking the path of least resistance. Such distortions occurring near a "flux-gate magnetometer" create a signal which can be amplified and calibrated to detect magnetic disturbances. *See, e. g.,* Chapman, The Earth's Magnetism, 10–12, 17–19, 27, 28 (2d ed. 1951); J. Jaquet, No-Touch Frisk Electronic Weapons Detection paper presented at Conference on Electronic Crime Countermeasures, U. of Ky., April 22, 1971; Marshall, An Analytic Model for the Fluxgate Magnetometer, IEEE Transactions on Magnetics, Vol. MAG–3, No. 3 (Sept. 1967); Geyger, Flux-Gate Magnetometer Uses Toroidal Core, Electronics (June 1, 1962); Geyger, The Ring-Core Magnetometer—A New Type of Second-Harmonic Flux-Gate Magnetometer, Communication and Electronics (Mar. 1962).

Though these scientific principals are not matters of common knowledge they may be readily and accurately determined, are verifiable to almost a certainty and are not disputed. The literature was placed in the Court file, notice was given to the parties that the Court intended to rely upon it, and there was no objection by either party.

Under these circumstances the Court takes judicial notice of the scientific principles utilized in the design of the Friskem unit. It finds that such a machine, if properly constructed and operated, can perform in the manner described to the Court by testimony and manuals. *See, e. g.,* Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 201(b) (2) (March 1971); Korn, Law, Fact, and Science in the Courts, 66 Colum.L.Rev. 1080, 1089, 1107–1115 (1966); Davis, Judicial Notice, 55 Colum.L.Rev. 945, 948–952 (1955). *Cf.* Application of Hartop, 311 F.2d 249, 255–257, 50 CCPA 780 (1962) (safety of drugs); Golaris v. Jewel Tea Co., 22 F.R.D. 16, 20 (N.D.Ill.1958) (trichinosis dangers); United States v. Dreos, 156 F.Supp. 200, 208 (D.Md.1957) (radar); The S.C.L. No. 9, 37 F.Supp. 386, 391 (E.D.Pa.1939), aff'd, 114 F.2d 964 (3d Cir. 1940) (bouyancy); State v. Tomanelli, 153 Conn. 365, 216 A.2d 625 (1966) (radar); McKay v. State, 155 Tex.Cr.R. 416, 235 S.W.2d 173 (1950) (drunkometer); State v. Damm, 64 S.D. 309, 266 N.W. 667 (1936) (blood type).

Since no opinion was brought to the Court's attention taking judicial notice of magnetometer capabilities, the Court also relied upon expert testimony adduced at the hearing. Such reliance is often the first step in a process that passes through judicial notice to acceptance on a theory of *stare decisis. See, e. g.,* Maguire, et al., Cases and Materials on Evidence, 22–29, 65 (5th ed. 1965). This has been the experience in connection with such scientific techniques as use of fingerprints, ballistic comparison and radar. Testimony and exhibits adduced at the hearing and trial indicated that the Friskem device was designed, in accordance with scientific principles already described, specifically to meet the

requirements of the Task Force and that it was properly manufactured.

The model used in the instant case consists of a series of magnetometers in two vertical poles located 36 inches apart and amplification equipment and indicators contained in a console unit. As demonstrated in the Court, and as revealed in the various manuals, the operation of the equipment requires no understanding of its theory. Its calibration is easy and its adjustment can be assured by simple visual observations.

■ While the person who actually adjusted the machine at the airport was not available, it was proper to accept testimony with respect to the custom and practice of the enterprise. *See* Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 406 (March 1971). That practice demonstrated that the physical equipment was adjusted so that a light would flash when metal having the effect of a 25 caliber pistol passed through it.

The Friskem unit will be activated by a variety of objects including a collection of ordinary belongings carried by passengers. In fact, somewhere in the order of 50% of the persons who pass through trigger it. Since, however, this is only one of a series of separating stages intended as much for deterrent value as for ability to ferret out metal objects, its usefulness is substantial.

## IV

### IN CAMERA INVESTIGATION OF PROFILE

■ Were even one characteristic of the "profile" generally revealed, the system could be seriously undermined by hijackers fabricating an acceptable profile. Because of this serious danger, the Court excluded from the courtroom the public and the defendant—but not his attorney—when it took testimony which revealed the specific characteristics included in the profile and the findings which led to its adoption.

Defense counsel were permitted to hear all the testimony about the specific characteristics and were able to cross-examine witnesses. They were informed that should it be necessary to consult with their clients about any of this information they could make this known to the Court and it would then reconsider its decision to deny the information to the defendants. No such request was made.

The Court enjoined counsel not to reveal the profile and it has confidence that its injunction will be followed. Defendant argued that he be permitted to attend and be similarly enjoined but such an injunction could never be enforced. The evidence revealed that he was a narcotic addict or a dealer in narcotics or both who would feel no compunction about telling what he knew to all who would lend an ear in prison or out. Under these circumstances the Court had no choice but to exclude him.

The testimony revealed that studies underlying the profile were thorough. Procedures followed in developing it were adequate. Appropriate statistical, sociological and psychological data and techniques were utilized. The profile is a highly effective procedure for isolating potential hijackers.

After studying known hijackers, the task force compiled twenty-five to thirty characteristics in which hijackers differed significantly from the air-traveling public. By putting only a few of them together they could obtain a reliable combination sharply differentiating potential hijackers from non-hijackers.

During the testing period and shortly thereafter in 1969 the task force studied an additional sample of 30 new hijackers and found that over 90% of that group would have met the profile. There has been a continuous process of reevaluation in light of new hijackings and changes in trends of hijacking. Thus far the original profile has retained validity.

■ Those characteristics selected can be easily observed without exercising judgment. They do not discriminate against any group on the basis of religion, origin, political views, or race.

They are precisely designed to select only those who present a high probability of being dangerous. Thus, they violate none of the traditional equal protection standards. *See* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (discrimination against new parties); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (discrimination against race in miscegenation); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169 (1966) (discrimination against poor voters); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (discrimination against race in licensing); *cf.* Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (violations of equal protection standards are also violations of due process under Fifth Amendment).

The constitutional issue raised by the decision to exclude the defendant from the inquiry on the profile, while permitting his counsel to attend and cross-examine witnesses, is obvious. Defendant has both a right to confront witnesses against him and to a public trial.

(a) *Public trial*

A public trial is guaranteed by the Fifth and Sixth Amendments. *See also* Fed.R.Crim.P. 43; Annot., Accused's Right, Under Federal Constitution, to be Present at This Trial, 25 L.Ed.2d 931 (1970). As the Supreme Court noted:

"We start with the proposition that it is a 'public trial' that the Sixth Amendment guarantees to the 'accused.' The purpose of the requirement of a public trial was to guarantee that the accused would be fairly dealt with and not unjustly condemned." Estes v. Texas, 381 U.S. 532, 538–539, 85 S. Ct. 1628, 1631, 14 L.Ed.2d 543 (1965).

■ American distrust for secret proceedings was roused by persecutions of the Inquisition and the Star Chamber; it has been nurtured by contemporary examples of abuse in a variety of repressive regimes. "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." In re Oliver, 333 U.S. 257, 268–272, 68 S.Ct. 499, 505, 507, 92 L.Ed. 682 (1948). "[S]ecret tribunals were effective instruments of oppression." Estes v. Texas, 381 U.S. 532, 539, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965). This right to a public trial attaches at the suppression hearing—often the crucial stage. United States ex rel. Bennett v. Rundle, 419 F.2d 599, 605–608 (3d Cir. 1969).

■ The public has an independent right to be present to see that justice is fairly done. It is important that our citizens be free to observe court proceedings to insure a sense of confidence in the judicial process. Conducting trials behind closed doors might engender an apprehension and distrust of the legal system which would, in the end, destroy its ability to peacefully settle disputes. In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 506, n. 24, 92 L.Ed. 682 (1948); Lewis v. Peyton, 352 F.2d 791, 792 (4th Cir. 1965); *cf.* Estes v. Texas, 381 U.S. 532, 541, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965); United States ex rel. Bennett v. Rundle, 419 F.2d 599, 606 (3d Cir. 1969).

Despite the important rights conferred on both the defendant and the public by the Constitution, exclusion of the public, or portions of it, for limited purposes and for short periods is sometimes justified in the public interest or in the interest of the defendant. Thus the risk of danger to witnesses or the need to preserve order warrants closed proceedings. *See, e. g.,* Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (authorizing limitation of the press and media during the trial to protect the defendant); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (same); United States ex rel. Bruno v. Herold, 408 F.2d 125 (2nd Cir. 1969), cert. denied, 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970) (some spectators removed to avoid harassment of witness); United States ex rel. Orlando v. Fay, 350 F.2d 967 (2d Cir. 1965), cert. denied, Orlando v. Follette, 384 U.S. 1008,

86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966) (all spectators but press removed to preserve order); Geise v. United States, 262 F.2d 151 (9th Cir. 1958), cert. denied, 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959) (most of spectators cleared in rape case where prosecutrix and two other witnesses were of tender years and a large audience would inhibit testimony); Melanson v. O'Brien, 191 F.2d 963 (1st Cir. 1951) (general public excluded by state law in sex crime case where victim was a minor).

■ The danger in revealing the profile is so great as to warrant the public's exclusion for a limited period. There was no violation of the right to a public trial.

(b) *Right of confrontation*

■ A much more difficult issue is presented by exclusion of the defendant himself. Normally vital to a fair trial are Sixth Amendment rights to confront witnesses. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970); California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). So, too, are the more general elements of fairness in due process. Illinois v. Allen, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970); Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Lewis v. United States, 146 U.S. 370, 372–373, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892); Fed.R.Crim.P. 43. As in the case of the right to a public trial, a suppression hearing is considered part of the trial. United States v. Dalli, 424 F.2d 45, 48 (2d Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970). See Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) (impaneling of jury); United States v. Crutcher, 405 F.2d 239 (2d Cir. 1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969) (same).

■ The right is not absolute. It may be waived by acts or statements of the defendant. Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); United States v. Dalli, 424 F.2d 45 (2d Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970); United States v. Crutcher, 405 F.2d 239 (2d Cir. 1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1019, 22 L.Ed.2d 219 (1969). The Court may also exclude the defendant when necessary to preserve order and decorum in the courtroom. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

■ It might be argued that exclusion of the defendant constitutes harmless error when his counsel was present and the defendant could not by his presence have contributed to his defense. In this case the only *in camera* testimony concerned revelation of the actual criteria contained in the profile which the defendant irrefutably satisfied. Defense counsel was present throughout the testimony and cross-examined the witnesses thoroughly. Arguably no prejudice resulted. *See* Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The harmless error argument is, however, not sufficiently persuasive to justify the procedure adopted.

It is true that this defendant was in no position to assist his attorney with detailed knowledge of the events essential for a variety of tactical and other decisions in cross-examining, objecting and the like. *See* Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). But any defendant, if he is found guilty, should, as a matter of fundamental fairness and as part of the rehabilitative process, have the assurance, by reason of his direct observation, that justice was done. There could hardly be anything more rankling to a defendant and destructive of his morale and incentive to reform than to have the nagging suspicion that something was presented to the Court which should not have been. This factor, among others places in doubt the validity of Snyder v.

Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), in which the Court approved the taking of a view without the defendant being present.

To justify the procedure utilized in this case against the enormous weight of constitutional strictures, precedent and good sense presents serious difficulties. Nevertheless, there is some support by analogy for the procedure adopted.

▮▮▮ Limited *in camera* investigations in the pre-trial discovery stages are suggestive of a limited power to keep information from defendant. *See* A.B.A. Minimum Standards for Criminal Justice Relating to Discovery and Procedure Before Trial §§ 2.5, 2.6, 4.4, 4.6 (Tent. Draft May 1969); Fed.R.Crim.P. 16(e); Preliminary Draft of Proposed Amendment of Federal Rules of Criminal Procedure for the United States District Court, Rule 16(d) (e) (1970). Disclosure must be had if a failure will "infringe the constitutional rights of the accused" or if it is "regarding witnesses or material to be produced at a hearing or trial." A.B.A., Minimum Standards for Criminal Justice Relating to Discovery and Procedure Before Trial § 2.6(b) (c) (Tent. Draft May 1969).

▮▮▮ Even the state secret privilege may not be utilized in a way that will deny a defendant constitutional rights. The Proposed Rules of Evidence for the United States District Courts and Magistrates provides, with respect to military and state secrets, that a showing of privilege may be made in the absence of the defendant but in the presence of his counsel with the judge taking "any protective measure which the interests of the government and the furtherance of justice may require." Revised Proposed Rule 509(b) (March 1971). But the Proposed Rules require that if the government is a party and if it appears that another party is "thereby deprived of material evidence" a judge shall make any further orders "which the interests of justice require, including striking the testimony of a witness, declaring a mistrial, [and] finding against the government * * *." Revised Proposed Rule 509(d) (March 1971).

In any event, the privilege in the Proposed Rules of Evidence applies only to matters concerning "the national defense or the international relations of the United States." Revised Proposed Rule 509 (a) (March 1971). It probably would not be interpreted to cover the case now before us. *But see* the broader rule described in 8 Wigmore on Evidence § 2378 (McNaughton rev. 1961). *Cf.* United States v. Reynolds, 345 U.S. 1, 6, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953).

Generally, where this secret of state privilege has been applied and where it is directly related to a substantive issue in a criminal case dismissal has been required. *See, e. g.*, United States v. Reynolds, 345 U.S. 1, 12, 73 S.Ct. 528, 534, 97 L.Ed. 727 (1953); United States v. Andolschek, 142 F.2d 503 (2d Cir. 1944); Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Advisory Committee Note at p. 63 (March 1971). *Cf.* Alderman v. United States, 394 U.S. 165, 182, 89 S. Ct. 961, 971, 22 L.Ed.2d 176 (1969) (surveillance records not to be submitted for *in camera* investigation); Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969) (surveillance records submitted to court for *in camera* determination of which records defendant was entitled to examine); Giovdano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) (Mr. Justice Stewart concurring) (same); Williamson v. United States, 272 F.2d 495 (5th Cir. 1959), cert. denied, 362 U.S. 920, 80 S.Ct. 672, 4 L.Ed.2d 740 (1960) (secret location of an automobile serial number need not be revealed); People v. Ramistella, 306 N.Y. 379, 118 N.E.2d 566 (1954) (contra); United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S. Ct. 362, 96 L.Ed. 688 (1952) (state secret; *in camera* examination of wiretap transcripts to determine whether evi-

dence at trial was fruit of illegal wiretap was error where defense not permitted to see transcripts); United States v. Grayson, 166 F.2d 863 (2d Cir. 1948) (refusal to disclose documents declared confidential by S.E.C. vitiated conviction).

A closer analogy to the instant case is provided by the informer rules. The government has a well recognized privilege to refuse to disclose the identity of an informer. *See* McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed. 2d 62 (1967); Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 510 (March 1971); McCormick on Evidence § 148 (1954); 8 Wigmore on Evidence § 2374 (McNaughton rev. 1961).

The cases draw a distinction between informer evidence respecting material facts in issue and that concerning a preliminary question of the admissibility of relevant evidence. McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). If the informer may have evidence "necessary to a fair determination of a material issue in" a criminal case, an election by the prosecutor not to disclose must lead to dismissal. Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 510(c) (2) (March 1971). As the United States Supreme Court noted in *Roviaro*:

> "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the government withholds the information, dismiss the action." 353 U.S. at 60–61, 77 S.Ct. 623, 628.

Where, however, guilt or innocence is not directly in issue and the informer's name or information bears only on the legality of the method of obtaining the evidence the Court has a much greater discretion. *See* McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); United States v. Malo, 417 F.2d 1242 (2d Cir. 1969), cert. denied, 397 U.S. 995, 90 S.Ct. 1135, 25 L.Ed.2d 403 (1970); Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 510(c) (3) (March 1971). This follows in part from the fact that when the issue is one of probable cause for the authority to arrest or obtain a warrant, rather than guilt, it may well be determined to a reasonable degree of probability without the name of the informer being revealed. The distinction underlies Rule 510(c) of the Proposed Rules of Evidence reading:

> "(2) *Testimony on Material Issue.* If an election is made not to disclose the identity of an informer and the circumstances indicate a reasonable probability that the informer can give testimony or information necessary to a fair determination of a material issue in the case, the judge shall on motion of the accused in criminal cases dismiss the proceedings, and he may do so on his own motion. In civil cases he shall make such order as may be just.

> (3) *Legality of Obtaining Evidence.* If information from an informer is relied upon to establish the legality of the means by which evidence was obtained and the judge is not satisfied that the information was received from an informer reasonably believed to be reliable, he may require the identity of the informer to be disclosed. The judge may permit the disclosure to be made *in camera* or make any other order which justice requires. All counsel shall be permitted to be present at every stage at which any counsel is permitted to be present. If disclosure of the identity of the informer is made *in camera,* the record thereof shall be sealed and preserved to be made available to the appellate court in the event of an appeal."

Revised Proposed Rules of Evidence for the United States District Courts and Magistrates (March 1971).

At the suppression hearing stage the proposed federal rule permits the trial judge to provide for disclosure of the informer's identity *in camera* or to make any other order which justice requires. Revised Proposed Rule 510(c) (3). See United States v. Winters, 420 F.2d 523, 524 (3d Cir. 1970) (*in camera* interview of informants); United States v. Jackson, 384 F.2d 825, 827 (3d Cir. 1967), cert. denied, 392 U.S. 932, 88 S.Ct. 2292, 20 L.Ed.2d 1390 (1968).

 As a practical matter a form of *in camera* procedure in some suppression hearings is mandated by the Supreme Court's decisions in Roviaro v. United States and McCray v. Illinois, which indicate that the decision to disclose an informer's identity involves a balancing of interests. The Court declared in *Roviaro:*

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 628–629, 1 L.Ed.2d 639 (1957).

The point was underlined in *McCray* when the Court pointed out:

"What *Roviaro* thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials. Much less has the Court ever approached the formulation of a federal evidentiary rule of compulsory disclosure where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake." McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed. 2d 62 (1967).

Realistically, the trial court can perform its function only if it has access to more of the facts than it may ultimately be willing to reveal to the parties or to the public. To deny the judge the identity of the informer and whatever evidence he may be able to offer may prevent an effective evaluation of possible effect on the defendant's interests. It would turn the sensitive balancing required by *Roviaro* and *McCray* into a "judicial guessing game." United States v. Day, 384 F.2d 464, 468–470 (3d Cir. 1967) (concurring opinion). *See also* United States v. Jackson, 384 F.2d 825, 827 (3d Cir. 1967), cert. denied, 392 U.S. 932, 88 S. Ct. 2292, 20 L.Ed.2d 1390 (1968).

The procedure incorporated in Proposed Rule 510 provides a sensible and effective means of carrying out the Supreme Court mandate. Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Advisory Committee Note at p. 66 (March 1971). The trial judge requires disclosure of the informer's identity and in some cases actually examines him, on the record but *in camera.* If one counsel is present then all counsel must be present. The record is sealed and preserved for the appellate courts while all present are enjoined not to reveal the testimony given. The judge has the assistance of adversarial advocacy, if he wishes it, and he can make an informed decision regarding suppression while at the same time preventing needless prejudice to law enforcement activities.

The persuasiveness and force of the informer analogy to the case before us is apparent. In the informer cases a person has supplied the authorities with information which, if it is reliable, furnishes a basis for a search warrant, or in some instances an arrest and search without a warrant. Disclosure of his identity is demanded in order to determine the reliability of his information and thus to evaluate the validity of the

seizure made on its authority. In the case before us the testimony indicated that the airlines personnel at the boarding area act in close conjunction with the U. S. Marshals in a combined effort to thwart potential hijackers. While the Marshals ultimately perform the "frisk" it is the airline employees who have primary responsibility for applying the profile and designating "selectees." In fact, the uncontroverted testimony of the Marshals in this case was that they did not determine whether a passenger was a selectee but rather relied solely on the representation of the Pan American officials. In effect the system itself, communicating through the airline, acts as an informer providing information leading to interview and search. The reliability of that information depends upon the nature of the profile and on how well the airline employees have applied it.

In fact, the instant case actually presents a stronger case for nondisclosure to the defendant because the informant is an objective system, not an individual who might be known to the defendant. He could not, by his presence, hope to impugn its credibility. Furthermore, since the level of probability required to justify a frisk is lower than "probable cause" there is a corresponding lower necessity for disclosure.

V

FRISK

The Fourth Amendment requires " * * * that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure * * *." Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Supreme Court "decisions make clear that only in a 'few specifically established and well-delineated' situations" can a warrantless search be justified. Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970). See also, e. g., Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); Katz

v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

■ No warrant was obtained for the search in this case, nor, as a practical matter could one have been expected. The anti-hijacking system depends upon being able to swiftly sift out potential hijackers for closer scrutiny while permitting all passengers including "selectees" to board unless weapons are discovered. Exigencies of time precluded the Marshals from obtaining a warrant in this situation. See Camara v. Municipal Court, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967).

■ The government has argued that continuing the boarding process after reading the posted and clearly observable signs which state "PASSENGERS AND BAGGAGE SUBJECT TO SEARCH" amounts to implied consent to searches such as occurred in this case. There was no evidence of express consent such as found in Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946), vacated on rehearing without stating grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947). Consent to a search involves a relinquishment of fundamental constitutional rights and should not be lightly inferred. United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965); United States v. Viale, 312 F.2d 595, 601 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963).

"[A]n accused's voluntary consent must be proven by clear and positive evidence. A consent is not a voluntary one if it is the product of duress or coercion, actual or implicit. Moreover, to be voluntary, a consent must have been unequivocal, specific, and intelligently given." United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963).

Cf. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Colum.L.Rev. 130 (1967).

■ The government has failed to sustain its burden of establishing any sort of voluntary consent. The evidence shows only that the defendant did not resist or protest when the Marshals asked him to accompany them to the private area adjacent to the boarding ramp for a search. Such conduct by one who may think himself in custody (although actual custodial detention was not established) hardly amounts to an "unequivocal, specific, and intelligently given" consent.

Nor can the government properly argue that it can condition the exercise of the defendant's constitutional right to travel on the voluntary relinquishment of his Fourth Amendment rights. *See* Shapiro v. Thompson, 394 U.S. 618, 629–630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). Implied consent under such circumstances would be inherently coercive. The government's theory is further called into question by the testimony of the two Marshals who performed the searches in this case. They testified that the defendant was not free to go at any time after he had been interviewed by them. Thus, the defendant and others similarly situated could not vitiate the "consent" by reversing a decision to board the aircraft.

■ The search cannot be justified as one "incident" to an arrest. Testimony of both Marshals revealed that the arrests were not made until after the frisk had been completed and the contraband seized. *See* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685 (1969). Similarly, there is no evidence of "hot pursuit" (*see* Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)) or danger of imminent destruction of any known evidence. *See* Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). No apparent offense was observed being committed in the presence of these officers which would have justified the search. *See* Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The contraband was certainly not in "plain view." *See* Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). *See also*, generally, Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Thus, the only exception to the warrant rule under which the search of this defendant can be justified is the protective "frisk" for weapons authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ The patting down of a person— or as it is commonly known, frisking— and the investigatory "stop" have been legally differentiated from an arrest and "a full blown search for evidence of crime." Terry v. Ohio, 392 U.S. 1, 8, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 68, 88 S.Ct. 1889, 1905, 20 L.Ed.2d 917 (1968) (concurring opinion). What appears to be required is a showing of some appreciable probability of danger created by someone with a weapon. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L. Ed.2d 917 (1968); McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). This probability is less than that required to arrest but more than that which would support a surmise or hunch. Speaking of the higher arrest standard, the Supreme Court in *Henry* pointed out:

> "[E]vidence required to establish guilt is not necessary. * * * On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959).

In *Terry* the Court explicitly rejected the contention that a protective weapons search could be performed only incident to an arrest on "probable cause." Terry v. Ohio at 25, 88 S.Ct. 1868, 1882. At the same time it refused to sanction frisks on mere "inarticulate hunches." Terry v. Ohio at 22, 88 S.Ct. 1868, 1880.

The problem, then, is to determine what level of knowledge by the Marshal is necessary to permit this intrusion on the person.

Implied in terms such as "probable cause" or "reasonableness" is a continuum of probability that the subject has been, is, or is about to be, engaged in criminal activity; it begins with no evidence of such conduct and extends to almost certainty. Ranked along this continuum are various degrees of probability justifying different types of intrusion upon the privacy of the individual. *Cf.* LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters* and Beyond, 67 Mich.L.Rev. 40, 53–88 (1968); Player, Warrantless Searches and Seizures, 5 Geo.L.Rev. 269, 274–276, 293 (1971).

An investigative "stop" requires one degree of probability, while a "frisk" in many cases requires a higher level. At other points on the scale are levels of probability justifying the various exigent circumstance intrusions typified by border searches, automobile searches, those occasioned by hot pursuit and the like. Finally, at the practical end of the continuum we find the classic "probable cause" levels which will justify the issuance of search warrants, and searches incidental to arrest with or without a warrant.

 The relative positions and levels of probability required have not been and, as a practical matter, cannot be precisely fixed; the most we can hope to accomplish at this juncture is to indicate that some relatively gross differentiations exist between the various levels. It is not clear, for example, whether a customs "exit" search requires a higher probability than that for a customs entrance search (*cf.* United States v. Marti, 321 F.Supp. 59 (E.D.N.Y.1970)), or whether an automobile search requires more or less certainty than a search of someone entering at a border. Even the degree of probability required to justify one particular form of intrusion is not constant. In each case it depends upon balancing the degree of incursion into the individual's privacy against the society's interest in the intrusion at the particular moment as perceived from the then known facts. As the Supreme Court in *Terry* noted:

"In order to assess the reasonableness of [the officer's] conduct as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.'" Terry v. Ohio, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

*Cf.* Biehunik et al. v. Felicetta et al., 441 F.2d 228 (2d Cir. 1971) (balance of public and private interests in requiring lineup of 62 police officers). *See also* The Supreme Court, 1967 Term, 82 Harv. L.Rev. 63, 181 (1968).

In balancing these interests,

" * * * many factors would be taken into account including the seriousness of the offense, the absolute need to conduct this type of investigation, the nature of the locale, activities of the suspect, the danger to the public if immediate action is not taken, the nature and length of detection, and the harm to the suspect." Player, Warrantless Searches and Seizures, 5 Geo.L.Rev. 269, 277 (1971).

Even "the degree of community resentment aroused by particular practices is clearly relevant to an assessment * * of the intrusion. * * * *" Terry v. Ohio, 392 U.S. 1, 17, n. 14, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). *Cf.* Schwartz, Stop and Frisk (A Case Study in Judicial Control of the Police, 58 Journal of Criminal Law, Criminology, and Police Science 433, 452–453 (1967). Moreover, the "manner" in which the frisk was "conducted is * * * [a] vital * * * part of the inquiry." Terry v. Ohio, *supra*, at 28, 88 S.Ct. 1868, 1883.

"Because one variable is the degree of imposition on the individual * * less evidence is needed to meet the probable cause test when the consequences for the individual are less serious." LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters* and Beyond, 67 Mich. L.Rev. 40, 54 (1968).

For example, a particular intrusion— say an exit border search—might be justified only upon a very significant showing of probability if the purpose of the search was merely to stop the flow of contraband out of the country. We might postulate—for the sake of illustration only—that such a search would require a 33% probability. If, however, government officers have information indicating that a bomb is being taken aboard an airplane, the overwhelming societal interest created by the imminent danger of passenger deaths should the information prove accurate might justify the same type of search on a much lower probability—say 5%. These figures merely *suggest how this sliding scale of probability operates.* Rarely do the courts evaluate a fact situation capable of such precise quantitative analysis.

Returning to the instant case the problem is whether the screening program by itself produces sufficient information to justify a cursory weapons "frisk" under the standard established in Terry v. Ohio. To justify a particular intrusion the "officer must be able to point to specific and articulable facts". Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). In determining whether sufficient probability existed it "is imperative that the facts be judged against an objective standard." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). As the Supreme Court put it, the question is:

" * * * would the facts available to the officer at the moment of seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? (citing cases). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, * * *." *Terry, supra* at 21–22, 88 S.Ct. 1868, 1880.

*See* Williams v. Adams, Warden, 441 F.2d 394 (2d Cir. 1971); Ballou v. Massachusetts, 403 F.2d 982, 985–986 (1st Cir. 1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969); United States ex rel. McArthur v. Rundle, 402 F.2d 701, 705 (3d Cir. 1968); United States v. Hostetter, 295 F.Supp. 1312, 1315–1317 (Del.1969).

Part of the difficulty in developing a rule for frisks is that the policeman, assuming his good faith, will be acting on a subjective standard—his own immediate sense of risk to himself—while the court testing his action for purposes of admissibility will be acting on an objective standard—what a reasonably prudent policeman in his position would do after weighing the risks of harm from possible hidden weapons presented by the particular known circumstances against our society's aversion to physical intrusions on the person of a free man. *See,* Schwartz, Stop and Frisk (a Case Study in Judicial Control of the Police, 58 Journal of Criminal Law, Criminology, and Police Science 433, 445–450 (1967). Where the standard of action— necessarily almost unreflective and reflexive—is to be tested after the event by a non-congruent rational test, the deterrent effect of the rule must perforce become less than complete. It is for this reason, among others, that many learned in the law have eschewed mere negligence as a predicate for serious criminal prosecutions. *Cf., e. g.,* United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971); Wechsler and Michael, A Rationale of the Law of Homicide: I, 37 Colum.L.Rev. 701, 717–723 (1937); A.L.I., Model Penal Code § 2.02 (May 4, 1962); G. Williams, Criminal Law §§ 9–31 (1953).

Yet the objective rule does have some useful prophylactic effect. Terry v. Ohio, 392 U.S. 1, 12–13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). At the

very least it provides some insurance against dishonesty by the policeman who does not in fact have reason to suspect that the subject is armed, but who would be willing to fabricate his remembered emotions to validate a productive frisk. *See* Chevigny, Police Abuses in Connection with the Law of Search and Seizure, 5 Crim.L.Bul. 3, 13–23 (1969). And guarding against this danger becomes particularly important if, as we believe, a proper frisk permits seizure of non-weapon contraband. Moreover, the objective rule signals to the public at large that, to the extent possible, courts do what they can to maintain constitutional protections *as more than mere verbal symbols.*

The standard of probability which is required to justify intrusions at the "frisk" level have been variously stated. The *Terry* court concluded that:

"[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry, supra* at 27, 88 S.Ct. 1868, 1883 (1968).

The Court's stress was not on the difference between absolute certainty and some lesser degree of certainty but rather on the distinction between "prudence" and "imprudence" under the surrounding circumstances.

Professor LaFave has analyzed the decision in *Terry* by comparing the "frisk" standard with the traditional probable cause to arrest. He concludes that probable cause requires that it be "more probable than not" that a crime has been or is being committed and further that

" * * * a protective search is permissible when there is a reason to believe that the suspect may be armed and dangerous. This * * * formulation * * * would seem to permit use of the substantial possibility test in much the same way as in determining whether there are grounds for a stop, as discussed earlier. In short, the officer would not have to establish that it was more probable than not that the suspect was armed, but only that there was a *substantial possibility* that the suspect possessed items which could be used for an attack and that he would so use them." (Emphasis added.) LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters* and Beyond, 67 Mich.L.Rev. 40, 87 (1968).

Another commentator compares the arrest to the stop and frisk standard and arrives at yet another formulation—the probability of impending criminal activity.

"The essence of the probable cause standard is the inference of probable guilt, which can be reviewed by a disinterested magistrate. In the type of situation exemplified by *Terry*, however, the facts available to the policeman clearly cannot support an inference of probable guilt, for no 'primary crime' has as yet been committed. In this situation the intrusion is made for the purpose of deterring an as yet incipient crime. By analogy to the arrest standard, investigation would be considered 'appropriate' when there is a probability that criminal activity is under way, although as yet possibly only in the planning stage. The difference between probable cause and this stop and frisk standard would turn not on differing degrees of subjective certainty of guilt, but on the differing police actions which the available evidence will validly support. Both forms of intrusion would require concrete, reproducible facts to justify them; it is only the nature of these facts that would vary. For arrest there would have to be a probability of guilt; for stop and frisk, a probability of impending criminal activity." The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 184 (1968).

New York, by contrast, has provided statutory authority for stops and frisks predicated on "reasonable suspicion" of criminal activity. N.Y.Code of Cr.Proc. § 180–a. *See also* Sibron v. New York, 392 U.S. 40, 60, 88 S.Ct. 1889, 1901–

1902, n. 20, 20 L.Ed.2d 917 (1968) (discussing New York Statute authorizing a stop and frisk on "reasonable suspicion"); People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (1967) (same). To the extent that New York's standard is subjective it is at variance with that utilized in the federal courts. *See, e. g.,* United States v. Unverzagt, 424 F.2d 396, 398 (8th Cir. 1970) (may frisk when "reasonably necessary" for officers' protection); United States v. Thompson, 420 F.2d 536, 540 (3d Cir. 1970) (when officer "justifiably believes" the individual is armed); LaFave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters,* and Beyond, 67 Mich.L.Rev. 40, 87 (1968) ("substantial possibility test").

We need not now determine which verbal formulation of the standard is correct. For our purposes there is a common denominator. A reviewing court must: (1) determine the objective evidence then available to the law enforcement officer and (2) decide what level of probability existed that the individual was armed and about to engage in dangerous conduct; it must then rule whether that level of probability justified the "frisk" in light of (3) the manner in which the frisk was conducted as bearing on the resentment it might justifiably arouse in the person frisked (assuming he is not about to engage in criminal conduct) and the community and (4) the risk to the officer and the community of not disarming the individual at once.

The anti-hijacking system is unusual in that it provides statistics showing the precise probabilities involved. Based upon the surveys available, out of every approximately 15 persons who are frisked one person is found with a weapon. Thus the probability that any person who is selected to be frisked has a weapon is approximately 6%. We know that the frisk is conducted in private with as much courtesy as the circumstances permit and that those who are frisked and allowed to go on their way generally welcome the protective measures taken in their behalf rather than resent them. The substantial interest in preserving the integrity and safety of air travel by preventing hijacking is obvious. In light of the circumstances, a 6% danger of arms suffices to justify a frisk.

The statistics discussed earlier indicate that only somewhere on the order of ⅒ of 1% of all passengers screened are actually frisked and that included in that .1% are practically all of the potential hijackers. The procedure, as designed, operates on purely objective criteria independent of race, color, or creed. It is well calculated to winnow out potential hijackers while occasioning a bare minimum of inconvenience to a very small percentage of the flying public—an inconvenience which most subjects seem, in fact, to accept. A United States Marshal would be imprudent were he to refuse to heed the warning given to him by the system. A narrowly circumscribed protective weapons "pat-down" or "frisk" is constitutionally permissible under these circumstances.

We do not think it significant that frisks are normally intended to protect the officer against sudden assault during an interview of the suspect while the anti-hijacking frisk is utilized to protect passengers and the frisk takes place after preliminary questioning. It is not without significance that *Terry* repeatedly recognized that the policeman's frisk could be justified on the ground that it was needed to "protect himself and *others* from possible danger." *Terry v. Ohio,* 392 U.S. 1, 28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) (emphasis supplied). *See also id.* at 28, 88 S.Ct. 1868, 1883 ("belief that his safety or that of others was in danger").

Mere statistical information such as that generated in this case does not, by itself, justify "frisks." If, for example reliable statistics were available that in a given community one person in fifteen (6%) regularly carried concealed weapons the police would not be justified in arbitrarily stopping and frisking anyone on the street. Such harassment by

police without more objective evidence of criminal activity or a legitimate investigative purpose is proscribed by the Fourth Amendment. *Cf.* Terry v. Ohio, 392 U.S. 1, 13–15, 88 S.Ct. 1868, 1875–1876, 20 L.Ed.2d 889 (1968); Pilcher, The Law and Practice of Field Interrogation, LVIII Journal of Criminal Law, Criminology, and Police Science, 465, 487–489 (1967). The Court is charged with the duty of balancing the competing interests of the individual and the society in each case presented. No single percentage figure can provide a test for constitutional legitimacy. *See* Terry v. Ohio, supra at 20–21, 88 S.Ct. 1868, 1879. *Cf.* Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329 (1971).

■ Even in the hijacking situation, any intrusion by a Marshal beyond the legitimate scope of a weapons search is clearly unjustified and the fruits of such an excessive search would be inadmissible in a subsequent criminal proceeding. *See* Terry v. Ohio, *supra* at 29, 88 S.Ct. 1868, 1884; Tinney v. Wilson, 408 F.2d 912, 916 (9th Cir. 1969); United States v. Hostetter, 295 F.Supp. 1312, 1317 (D.Del.1969). *Cf.* Sibron v. New York, 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

"[T]he sole justification of the search in the present situation is the protection of the police officer, and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

■ In this case the location and size of the object and the fact that it was tightly packed and hard covered and that it was large enough to be a container for a pistol or even explosive material gave the Marshal ample cause to require removal from underneath defendant's clothing. Visual observation of the package covered with tinfoil would have

increased the suspicion and apprehension of a reasonable officer. In fact, we find that the Marshal's conduct of this investigation was almost an exact model of the "frisk" approved in Terry v. Ohio.

## VI

### SEIZURE OF CONTRABAND

■ We come now to the final Fourth Amendment issue before us and that is whether a frisk conducted in good faith to locate weapons believed to be present will justify the seizure of evidence of crimes other than those involved in boarding a plane with a weapon. The answer is yes.

If a search is conducted in good faith to locate a weapon and if it does not go beyond the limits of what is required to uncover such an object then the officer need not close his eyes to evidence of other crimes which he may uncover. *Cf.* Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947), overruled on other grounds, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (arrest and search for forged checks but altered draft cards discovered and used to obtain conviction); Klor v. Hannon, 278 F.Supp. 359, 367 (C.D.Calif.1967); Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (arrest for narcotics, evidence of bank robbery discovered); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (search for evidence of bookmaking, pornographic films seized).

As the Supreme Court wrote:

"A crime was thus being committed in the very presence of the agents conducting the search. Nothing in the decisions of this Court gives support to the suggestion that under such circumstances the law-enforcement officials must impotently stand aside and refrain from seizing such contraband material. If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents

of government property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated." Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947), overruled on other grounds, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

In this regard it is not clear whether Peters v. New York, a companion case to *Terry*, can be explained on the basis of a search following valid arrest or of a frisk which turned up contraband. *See, e. g.,* Sibron v. New York, 392 U.S. 40, 59, n. 20, 88 S.Ct. 1889, 1901, 20 L.Ed. 2d 917 (1968). What appeared to have been a frisk for weapons revealed an envelope of burglar's tools subsequently admitted in evidence. While the majority apparently found an antecedent arrest justifying the search, Mr. Justice White treated *Peters* as a frisk case and concurred on that ground. Sibron v. New York, 392 U.S. 40, 68–69, 88 S.Ct. 1889, 1905, 20 L.Ed.2d 917 (1968). So, too, apparently did concurring Justices Fortas (*Id.* at 70, 88 S.Ct. 1889, 1905) and Harlan (*Id.* at 70–71, 88 S.Ct. 1889, 1908). *Cf.* Peters v. New York, 392 U.S. 40, 68–69, 88 S.Ct. 1912, 1913, 20 L.Ed.2d 917 (1968) (Mr. Justice Douglas concurring) ("probable cause to seize appellant and accordingly to conduct a limited search of his person for weapons").

In *Sibron* the frisk revealed a tinfoil envelope of narcotics. The majority opinion in *Terry* refers to *Sibron* as an example of "the concrete factual circumstances" in cases involving "a protective seizure and search for weapons." Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Moreover, the majority opinion in *Sibron* and *Peters* speaks of both these cases as "companion cases" to *Terry*. 392 U.S. 40, 43, 88 S.Ct. 1889, 1892, 20 L.Ed.2d 917 (1968). The contraband in *Sibron* was suppressed because, the Supreme Court held, this was not simply a bonafide search for weapons fortuitously turning up narcotics, but rather a search for narcotics sought to be justified upon a meritricious claim of suspicion that armaments were present. Sibron v. New York, 392 U.S. 40, 62–66, 88 S.Ct. 1889, 1902–1904, 20 L.Ed.2d 917 (1968). And Mr. Justice Black dissented in *Sibron* on the ground that an affirmance on the ground of a proper frisk was called for. *Id.* at 79–81, 88 S.Ct. 1889, 1910–1911.

What can be said with some assurance is that *Terry, Sibron* and *Peters* do not stand for the proposition that contraband other than weapons should be excluded if it is discovered by a valid frisk. La-Fave, "Street Encounters" and the Constitution: *Terry, Sibron, Peters* and Beyond, 67 Mich.L.Rev. 40, 91–93 (1968); The Supreme Court, 1967 Term, 82 Harv. L.Rev. 63, 185–186 (1968).

Upon discovering that the suspicious package contained a white powder the Marshal would have been relieved to know that it was not an explosive. But, having discovered that it contained what appeared to be narcotics, it would have been unseemly to have handed back the package, assisting the defendant in a violation of Section 174 of Title 21 of the United States Code. No rule of law requires such an absurd result.

While there may be some merit to the argument that exclusion of evidence of other crimes would serve to deter police from using the frisk as a guise for a general contraband search, we need not fear such abuse in this case since it is patent that the anti-hijacking system is specifically designed to isolate potential hijackers and to seize weapons. *Cf.* The Supreme Court, 1967 Term, 82 Harv.L. Rev. 63, 186 (1968).

We conclude that contraband seized as a result of a properly circumscribed investigatory frisk predicated on information generated by a well administrated federal anti-hijacking system is admissible in evidence. Such a seizure comports with established Fourth Amendment principles and were it not for the special circumstances of this case we would not hesitate to deny this motion to suppress.

## VII

## DISQUIETING IMPLICATIONS OF SYSTEM

We reach this conclusion recognizing that the system used is disquieting. Employing a combination of psychological, sociological, and physical sciences to screen, inspect and catagorize unsuspecting citizens raises visions of abuse in our increasingly technological society. Proposals based upon statistical research designed to predict who might commit crimes and giving them the special attention of law enforcement agencies is particularly disturbing. There is a basis for

" * * * what anti-utopians like Huxley and Orwell have forecast—though * * * these dismal despotisms will be far more stable and effective than their prophets have foreseen. For they will be equipped with techniques of inner-manipulation as unobtrusively fine as gossamer." T. Roszak, The Making of a Counter Culture xiii (1969).

Undoubtedly there are persons with objectively observable characteristics who provide a higher statistical probability of danger than the population as a whole. *Cf.* Williams, Neural Factors Related to Habitual Aggression: Consideration of Differences Between Those Habitual Aggressives and Others Who Have Committed Crimes of Violence, 92 Brain: A Journal of Neurology 503 (1969); Bonkalo, Electroencephalography in Criminology, 12 Canadian Psychiatric Association J. 281 (1967); Woods, Adolescent Violence and Homicide, Vol. 5, No. 6 Archives of General Psychiatry 38 (1961). But our criminal law is based on the theory that we do not condemn people because they are potentially dangerous. We only prosecute illegal acts. Putting a group of potential violators in custody on the ground that this group contained all or nearly all of the people who would commit crimes in the future would raise the most serious constitutional issues. *See,* Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va.L.Rev.

371, 379–380, 394–396 (1970). *But, cf.* Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). The procedure before us accomplishes no such result and raising such spectors does not assist in a rational evaluation of the anti-hijacking program. This system does not constitute a first step along the road to preventive detention of potentially dangerous classes of persons.

We need not fear that approving use of the magnetometer to search by means of unseen electromagnetic lines of force foretells approval of more frightening systems: for example, one searching the brain waves of members of the public, as they unsuspectingly pass by check points, to determine if they are tense or frightened and thus, possibly, contemplating anti-social conduct. Pribram, 2 Brain and Behaviour 47–49 (1969); 1 *Id.* 456–461; Cohen, Magnetoencephalography: Evidence of Magnetic Fields Produced by Alpha-Rhythm Currents, 161 Science 784 (1968); Fischer and Watkins, Tuning in on the Living Brain, Saturday Review 46 (June 2, 1962); Berkhout, Walter and Adey, Alterations of the Human Electroencephalogram Induced by Stressful Verbal Activity, 27 Electroencephalography and Clinical Neurophysiology 457 (1969); Symposium, The EEG in Stress-Physiological and Psychological Aspects, Supp. 25 Electroencephalography and Clinical Neurophysiology 207–304 (1967). Such a use of technology might well raise serious problems of self incrimination which are not present in this case. *Cf.* Schmerber v. California, 384 U.S. 757, 760–765, 86 S.Ct. 1826, 1830–1833, 16 L.Ed.2d 908 (1966).

Even the use of the magnetometer might be an objectionable intrusion were it not accompanied by an antecedent warning from the profile indicating a need to focus particular attention on the subject. We do not now decide whether, in the absence of some prior indication of danger, the government may validly require any citizen to pass through an electronic device which probes beneath his clothing and effects to reveal what he carries with him.

Finally, in the case before us, though electromagnetic waves are intercepted, the analogy to a clandestine wiretap is not valid since no communication—internal or external—of the subject is involved. *Cf.* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

While candidly recognizing the disquieting possibilities suggested by the techniques of the anti-hijacking campaign, we are unpersuaded that the rights of air travellers generally have been or will be violated by the proper application of this system. We ought not be frightened out of taking sensible protective steps by the possibilities of misuse so long as our courts are in a position to prevent abuse should it arise.

## VIII

### SUPPRESSION IN THIS CASE

■ While evidence discovered during a frisk pursuant to this anti-hijacking procedure would normally be admissible, the special circumstances of the instant case require suppression. The Pan American Passenger Service Manager issued a memorandum on July 22, 1970 purporting to "update" the "profile" to be applied in the anti-hijacking screening procedure. This action was not authorized by Pan American Security Services, the United States Marshal Service, or the Federal Aeronautics Administration. It eliminated one criterion included in the official profile established by the F.A.A. and added two additional categories.

Both the government and Pan American disowned the memorandum and indicated that it had been withdrawn. Neither were able, however, to assure the Court that the boarding area personnel responsible for applying the profile to passengers on November 14, 1970 had not read the memorandum and were not following it. Under the circumstances, the Court must assume that the "updated" profile was, in fact, employed in selecting the defendant.

The one characteristic eliminated by this supplemental memorandum effectively excised from the screening procedure one of the fundamental characteristics of hijackers as described by Dr. Dailey during *in camera* testimony. One of the characteristics added introduced an ethnic element for which there is no experimental basis, thus raising serious equal protection problems. The second added criterion called for an act of individual judgment on the part of airline employees. The effect of these changes was to destroy the essential neutrality and objectivity of the approved profile.

In evaluating the constitutionality of the system that was actually in operation on the day in question we cannot now rely on the statistics presented to the Court since the properly conducted samplings utilized the official Task Force profile. These statistics were critical in our determination that this system was an appropriate method of protecting air travellers.

■ The procedure instituted to detect hijackers becomes unacceptable when abused in the manner described in this case. The approved system survives constitutional scrutiny only by its careful adherence to absolute objectivity and neutrality. When elements of discretion and prejudice are interjected it becomes constitutionally impermissible. While the abuse in this case was by airline officials, not the government, these employees were acting as government agents insofar as they designated "selectees" and alerted Marshals. The court's only effective means of controlling official excess is to refuse to admit in evidence the fruits of unconstitutional seizures. *See* Terry v. Ohio, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968); Mapp v. Ohio, 367 U.S. 643, 648–650, 81 S.Ct. 1684, 1687–1688, 6 L.Ed.2d 1081 (1961).

The government may not institute a system such as this one and then deny responsibility for properly policing it. Continuous supervision and control of personnel who have the power to intrude on constitutional rights is essential. *Cf.*

**1102**

Cortright v. Resor, 325 F.Supp. 797, 827 (E.D.N.Y.1971). Any system and the dangers it poses must be evaluated in the light of the skills and the dedication of those who will operate it. We must sometimes recognize that

"Operating personnel simply are less disciplined, less dedicated, and less concerned about doing the job right [and there is] nothing in our contemporary culture which is likely to reverse the trend." W. K. Jones, Regulation Under Fire: Consumers, The Environment, The Economy, and The Impact of Change, Twelfth Annual Columbia Law Symposium (Mar. 20, 1971).

The anti-hijacking system can be a valuable and effective method of protecting millions of air travellers from the threat of violence and sudden death in the air. Properly supervised it is also constitutional. Abuses such as the one which occurred in this case must, however, be eliminated if evidence obtained in its operation is to be used in our Courts.

IX

CONCLUSION

Defendant's motion to suppress evidence must be granted. Since without this evidence the government has no case, the indictment is dismissed.